# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――

Argued October 17, 2012     Decided January 4, 2013

No. 08-1250

NATURAL RESOURCES DEFENSE COUNCIL AND SIERRA CLUB,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

FINE PARTICULATE LITIGATION GROUP ET AL.,
INTERVENORS

―――――

Consolidated with 09-1102, 11-1430

―――――

On Petitions for Review of Final Rules of the
United States Environmental Protection Agency

―――――

*Paul Cort* argued the cause for the petitioners. *Tim D. Ballo* and *David S. Baron* entered appearances.

*Brian H. Lynk*, Attorney, United States Department of Justice, argued the cause for the respondent. *Geoffrey L. Wilcox* and *Stephanie L. Hogan*, Attorneys, United States Environmental Protection Agency, were on brief.

*Charles H. Knauss*, *Shannon S. Broome*, *Robert T. Smith*, *Denise W. Kennedy*, *John A. Bryson*, *Emily C. Schilling*,

*Leslie S. Ritts*, *Norman W. Fichthorn*, *Lauren E. Freeman*, *Lucinda Minton Langworthy* and *Lorane F. Hebert* were on brief for the intervenors. Michelle M. Schoeppe entered an appearance.

Before: HENDERSON and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The four petitioners[1] seek review of two final rules, promulgated pursuant to the Clean Air Act (CAA, Act), which govern implementation of the national ambient air quality standard (NAAQS) for "fine" particulate matter—that is, particulate matter (PM)[2] having a diameter equal to or less than 2.5 micrometers ($PM_{2.5}$). *See* Final Clean Air Fine Particle Implementation Rule, 72 Fed. Reg. 20,586 (Apr. 25, 2007) ($PM_{2.5}$ Implementation Rule); Implementation of the New Source Review (NSR) Program for Particulate Matter Less Than 2.5 Micrometers ($PM_{2.5}$), 73 Fed. Reg. 28,321 (May 16, 2008) ($PM_{2.5}$ NSR Implementation Rule) (collectively, Final

---

[1] They include the Natural Resources Defense Council, Sierra Club, American Lung Association and Medical Advocates for Healthy Air.

[2] "Particulate matter is the generic term for a broad class of chemically and physically diverse substances that exist as discrete particles (liquid droplets or solids) over a wide range of sizes." The particles "originate from a variety of anthropogenic stationary and mobile sources as well as from natural sources" and "may be emitted directly or formed in the atmosphere by transformations of gaseous emissions such as sulfur oxides ($SO_x$), nitrogen oxides ($NO_x$), and volatile organic compounds (VOC)." National Ambient Air Quality Standards for Particulate Matter, 62 Fed. Reg. 38,652, 38,653 (July 18, 1997).

$PM_{2.5}$ Implementation Rules).[3] In particular, the petitioners challenge the decision of the Environmental Protection Agency (EPA) to promulgate the Final $PM_{2.5}$ Implementation Rules pursuant to the general implementation provisions of Subpart 1 of Part D of Title I of the Act, 42 U.S.C. §§ 7501-7509a (Subpart 1), rather than the particulate-matter-specific provisions of Subpart 4 of Part D of Title I, *id*. §§ 7513-7513b (Subpart 4). We agree with the petitioners that EPA erred in applying the provisions of Subpart 1 rather than Subpart 4.

## I.

Section 109 of the Act mandates that EPA establish a primary NAAQS for each air pollutant for which EPA has issued "air quality criteria" under CAA section 108. 42 U.S.C. § 7409(a)(1).[4] The Act defines each such NAAQS as that standard "the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health." *Id*. § 7409(b)(1). EPA is required to "complete a thorough review" of each pollutant's standard and air quality criteria "at five-year intervals" and "make such revisions in such criteria and standards and promulgate such new standards as may be appropriate." *Id*. § 7409(d)(1). Once a NAAQS has been established, each state must adopt

---

[3]Under the Act's NSR provisions, new or modified pollutant sources must meet "strict standards," while existing sources are " 'grandfathered.' " *New York v. U.S. EPA*, 413 F.3d 3, 13 (D.C. Cir. 2005).

[4]The Act also requires EPA to promulgate a secondary standard, "the attainment and maintenance of which . . . is requisite to protect the public welfare from any known or anticipated adverse effects associated with" the pollutant. 42 U.S.C. § 7409(b)(2). In this case, EPA promulgated a single NAAQS as both the primary and the secondary standard.

and submit to EPA for approval a State Implementation Plan (SIP) that "provides for implementation, maintenance, and enforcement of [the NAAQS] in each air quality control region (or portion thereof) within such State." *Id.* § 7410(a)(1). Each SIP must "include enforceable emission limitations and other control measures, means, or techniques . . . , as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the [CAA's] applicable requirements." *Id.* § 7410(a)(2)(A).

Part D of CAA Title I governs "Plan Requirements for Nonattainment Areas" (that is, areas that have not attained compliance with the applicable NAAQS) and Subpart 1 thereof, added to the Act in 1977, addresses "Nonattainment Areas in General." Subpart 1 provides generally that, once EPA designates an area as "nonattainment," it "may classify the area" so as to establish an attainment deadline and it must establish a schedule for the state encompassing the nonattainment area to submit a SIP. *Id*. § 7502(a)(1)(A). The SIP, in turn, is required, inter alia, to (1) provide for implementation of control measures, (2) inventory existing emissions, (3) identify and quantify pollutant emissions permissible under the SIP from the construction and operation of all major new stationary emission sources, (4) require NSR permits for such construction and operation and (5) establish compliance schedules and timetables. *Id*. § 7502(c). Pursuant to this regime, in 1971, EPA established a particulate matter NAAQS applicable to "Total Suspended Particles," i.e., particulate matter up to 25-45 micrometers in diameter.

In 1987, EPA revised the NAAQS to apply only to particles equal to or smaller than 10 micrometers ($PM_{10}$)—a "size-specific indicator" it determined "represent[ed] those particles small enough to penetrate to the thoracic region" because "[t]he risks of adverse health effects associated with deposition of typical ambient fine and coarse particles in the

thorax (tracheobronchial and alveolar regions of the respiratory tract) are markedly greater than those associated with deposition in the extrathoracic (head) region." Revisions to the National Ambient Air Quality Standards for Particulate Matter, 52 Fed. Reg. 24,634, 24,639 (July 1, 1987) (footnote omitted) (1987 PM NAAQS Revisions).

In 1990, the Congress amended CAA Part D by adding to it Subparts 2 through 5, each of which contains additional provisions governing nonattainment plan requirements for a particular pollutant or group of pollutants. At issue here, Subpart 4 applies to "Particulate Matter Nonattainment Areas" and covers such matters as setting attainment dates for PM nonattainment areas, classifying the nonattainment areas (as "moderate" or "serious"), reclassifying them (e.g., upon failure to attain) and extending attainment dates. 42 U.S.C. §§ 7513-7513b; *see also id*. §§ 7511-7511f (ozone-specific requirements); *id*. §§ 7512-7512a (carbon monoxide-specific requirements).

In 1997, EPA again revised the particulate matter NAAQS, this time setting separate $PM_{2.5}$ standards for fine particles (having a diameter of 2.5 micrometers or less), while retaining the existing $PM_{10}$ standards. National Ambient Air Quality Standards for Particulate Matter, 62 Fed. Reg. 38,652, 38,654 nn.5-6 (July 18, 1997) (Final PM NAAQS Rule). We upheld the new particulate matter standards in 2002 after remand from the United States Supreme Court. *See Am. Trucking Ass'ns v. EPA*, 283 F.3d 355 (D.C. Cir. 2002) (applying *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001)).

In 2005, EPA published its Proposed Rule To Implement the Fine Particle National Ambient Air Quality Standards, 70 Fed. Reg. 65,984 (Nov. 1, 2005). EPA subsequently issued the final fine particle implementation rule in two stages. In 2007, it published the $PM_{2.5}$ Implementation Rule, setting out

the general SIP requirements for $PM_{2.5}$. EPA followed up in 2008 with the $PM_{2.5}$ NSR Implementation Rule to govern the NSR permitting process. In each of the two Final $PM_{2.5}$ Implementation Rules, EPA expressly followed the general implementation provisions in Subpart 1 of Part D rather than Subpart 4's particulate-material-specific provisions. *See* $PM_{2.5}$ Implementation Rule, 72 Fed. Reg. at 20,589 ("EPA is issuing this rule to implement the 1997 $PM_{2.5}$ NAAQS in accordance with the statutory requirements of the CAA set forth in Subpart 1 of Part D of Title 1, i.e., sections 171-179B of the Act. . . . EPA has concluded that Congress did not intend the Agency to implement particulate matter NAAQS other than those using $PM_{10}$ as the indicator in accordance with Subpart 4 of Part D of Title 1 . . . ."); $PM_{2.5}$ NSR Implementation Rule, 73 Fed. Reg. at 28,332 ("We do not agree that subpart 4 of part D applies to $PM_{2.5}$ nonattainment areas. Subpart 4 was added to the Act by Congress specifically to address the $PM_{10}$ NAAQS. We believe that the $PM_{2.5}$ standard should be implemented under subpart 1 of part D, which is the general provision of the Act related to NAAQS implementation."). The petitioners filed timely petitions for review of both the $PM_{2.5}$ Implementation Rule and the $PM_{2.5}$ NSR Implementation Rule.

## II.

We review EPA's interpretation of the CAA under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Natural Res. Def. Council v. EPA*, 489 F.3d 1250, 1257 (D.C. Cir. 2007). Under *Chevron*:

> We first ask "whether Congress has directly spoken to the precise question at issue," in which case we "must give effect to the unambiguously expressed intent of Congress." If the "statute is silent or ambiguous with respect to the specific issue," however, we move to the second step and defer to

the agency's interpretation as long as it is "based on a permissible construction of the statute."

*Id*. (quoting *Chevron*, 467 U.S. at 842-43) (other quotation marks omitted). Before addressing whether EPA correctly applied Subpart 1 under the *Chevron* framework, we first consider the timeliness of the petitioners' instant challenge.

### *A.*

EPA contends the petitioners' challenge is untimely because it should have been raised in 1997 when EPA issued the Final PM NAAQS Rule, which, EPA maintains, set out its final decision on Subpart 1's applicability. Because we conclude EPA did not take final reviewable action in 1997, the petitioners' challenge is timely.[5]

In urging that it finalized its decision in 1997, EPA relies on two excerpts from the preamble to the 1997 Final PM NAAQS Rule. First, EPA cites its response to comments challenging its authority to promulgate a separate $PM_{2.5}$ standard given that the 1990 amendments referred only to a $PM_{10}$ standard. At the conclusion of its response, EPA offered the following defense of its authority to promulgate the new $PM_{2.5}$ standards, rooted in Subpart 1, couched in plainly tentative language:

> EPA's analysis of its ability to implement a $PM_{2.5}$ standard under the provisions of subpart 1 of Part D of Title I does not support the view that Congress prohibited EPA from promulgating such a standard. Congress clearly specified an approach to the

---

[5]EPA acknowledges the instant petitions for review of the $PM_{2.5}$ Implementation Rule and the $PM_{2.5}$ NSR Implementation Rule were timely filed within sixty days after each rule's publication as required under 42 U.S.C. § 7607(b)(1). *See* Br. of Resp't 1.

implementation of the $PM_{10}$ standard in the provisions of subpart 4 of Part D of Title I of the Act. The EPA *believes* that the clear and express linkage of that approach to the $PM_{10}$ standard indicates that a different PM standard should be implemented under the general principles of subpart 1 of Part D of Title I of the Act. That Congress directed specifically how EPA and the States *should* implement the $PM_{10}$ standard does not carry with it the implication that Congress intended to prohibit EPA from exercising its otherwise clear and express authority to adopt a PM standard based on a different metric . . . .

Final PM NAAQS Rule, 62 Fed. Reg. at 38,695 (emphases added). Some pages later, in a footnote, EPA more affirmatively, albeit summarily, stated its position that implementation of the new standard need not and would not be governed by Subpart 4: "The SIP requirements of subpart 4 of Part D of Title I of the Act apply to SIPs for areas designated as not attaining NAAQS for $PM_{10}$. Those requirements will not apply to SIPs to implement the $PM_{2.5}$ NAAQS." *Id*. at 38,704 n.96. We conclude these two unembellished snippets, buried in the preamble to the 1997 Final PM NAAQS Rule, did not constitute final agency action so as to be reviewable in 1997.

"A final agency action is one that marks the consummation of the agency's decisionmaking process and that establishes rights and obligations or creates binding legal consequences." *Natural Res. Def. Council v. EPA*, 559 F.3d 561, 564 (D.C. Cir. 2009) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). We have observed that "[w]hile preamble statements," such as those just quoted, "may in some unique cases constitute binding, final agency action susceptible to judicial review, this is not the norm." *Id*. at

564-65 (citations omitted). As this case is not a "unique" one, we adhere to the norm.

The above quoted excerpts appear in a document expressly intended to "describe[] EPA's decision to *revise* the national ambient air quality standards (NAAQS) for particulate matter (PM)," Final PM NAAQS Rule, 62 Fed. Reg. at 38,652 (emphasis added)—it did not purport to detail how the revised standards should be implemented. Indeed, EPA had earlier addressed the issue of implementation in a separate Interim Implementation Policy on New or Revised Ozone and Particulate Matter (PM) National Ambient Air Quality Standards (NAAQS), 61 Fed. Reg. 65,752 (Dec. 13, 1996) (Interim Implementation Policy). Although the Interim Implementation Policy likewise expressed an intent to apply Subpart 1 to implement the PM$_{2.5}$ standard, 61 Fed. Reg. at 65,753, it made clear that, as its name suggests, it was only a temporary policy, which "would represent EPA's *preliminary* views" and "while it m[ight] include various statements that States must take certain actions, these statements [we]re made pursuant to EPA's *preliminary interpretations*, and thus d[id] *not bind* the States and public as a matter of law." *Id.* at 65,752 (emphases added). Accordingly, "[o]nly after EPA ha[d] made its interpretations final through rulemaking"— "follow[ing] the requirements of the Administrative Procedure Act, 5 U.S.C. section 553(b) and (c)"—"will they be binding on the States and public as a matter of law." *Id.* Given EPA's expressed intent to issue a final, binding notice-and-comment rule on the issue—to supplant its "preliminary" policies—we do not see how the quoted lines from the preamble to the 1997 rule revising the standard itself "mark the consummation of the agency's decisionmaking process" on how to implement the standard so as to constitute final agency action. *Bennett v. Spear*, 520 U.S. at 177-78 (internal quotation marks omitted). Instead, we conclude EPA consummated the decisionmaking process to implement the

$PM_{2.5}$ standard only when it published its final views in the two Final $PM_{2.5}$ Implementation Rules now under review. Notwithstanding its express and indefinite deferral of a final implementation policy in 1997, EPA argues the Supreme Court's decision in *Whitman v. American Trucking Associations*, 531 U.S. 457 (2001), requires us to hold otherwise. We are not so persuaded.

In *Whitman,* the Supreme Court reviewed EPA's decision to implement its "8-hour" 0.08 ppm NAAQS for ozone—which replaced the previous 1-hour ozone standard of 0.12 ppm—under Subpart 1's general nonattainment area provisions rather than under Subpart 2's ozone-specific provisions added in 1990. *See* National Ambient Air Quality Standards for Ozone, 62 Fed. Reg. 38,856, 38,873 (July 18, 1997) (Final Ozone NAAQS Rule) ("[T]he provisions of subpart 1 of part D of Title I of the Act would apply to the implementation of the new 8-hour $O_3$ standards."). The Court concluded that, in the main, the new ozone NAAQS should be implemented pursuant to Subpart 2 notwithstanding Subpart 2 was enacted to address the former 1-hour standard and some provisions might therefore be "ill fitted to implementation of the revised standard" and thus leave "gaps" for EPA to fill under *Chevron* step 2. *Whitman*, 531 U.S. at 483-84. The *Whitman* Court first addressed the threshold question whether Subpart 1 constituted final agency action subject to review and concluded that it did. *See id*. at 477-78.

Addressing the Interim Implementation Policy, which covered both the ozone and the particulate matter standards, the *Whitman* Court acknowledged: "If the EPA had done no more, we perhaps could accept its current claim that its action was not final." *Id*. at 477. The Court explained, however, that, vis-à-vis the ozone standard, EPA had done "more." After the White House issued a " 'Memorandum for the Administrator of the Environmental Protection Agency' that

prescribed implementation procedures for the EPA to follow," EPA "supplemented this memorandum with an explanation of the implementation procedures." *Id*.; *see* Implementation of Revised Air Quality Standards for Ozone and Particulate Matter, 62 Fed. Reg. 38,421, 38,422 (July 18, 1997) (Memorandum of July 16, 1997); Implementation Plan for Revised Air Quality Standards, 62 Fed. Reg. 38,423 (Implementation Memorandum Supplement). In a section of the Implementation Memorandum Supplement titled "Implementation of Ozone Standard," EPA explained that, after receiving comments on the proposed Interim Implementation Policy, it had "reconsidered" its interpretation in part and determined that "Subpart 2 should continue to apply as a matter of law for the purpose of achieving attainment of the current 1-hour standard." *Id*. at 38,424. But EPA made clear it adhered to its previously expressed view that "[o]nce an area attains the 1-hour standard, those provisions will no longer apply and the area's implementation of the new 8-hour standard would be governed only by the provisions of Subpart 1 of Part D of Title I." *Id*. EPA subsequently "published [this interpretation] in the explanatory preamble to its final ozone NAAQS under the heading, 'Final decision on the primary standard.' " *Whitman*, 531 U.S. at 477-78 (citing Final Ozone NAAQS Rule, 62 Fed. Reg. at 38,873). Based on this chronology, the Supreme Court found EPA's ozone implementation policy was final and reviewable, explaining:

> The EPA's "decisionmaking process," which began with the 1996 proposal and continued with the reception of public comments, concluded when the agency, "in light of [these comments]," and in conjunction with a corresponding directive from the White House, adopted the interpretation of Part D at issue here. Since that interpretation issued, the EPA has refused in subsequent rulemakings to reconsider

> it, explaining to disappointed commenters that its earlier decision was conclusive.

*Whitman*, 531 U.S. at 478-79 (citing 63 Fed. Reg. 31,014, 31,018-19 (1998)). The history of the $PM_{2.5}$ standard reveals no comparable decisionmaking process regarding implementation. The Implementation Memorandum Supplement did not even mention Subpart 1 or Subpart 4 in its discussion of the $PM_{2.5}$ implementation—much less distinguish between them or discuss their applicability vel non to implementation of the $PM_{2.5}$ standard. *See* 62 Fed. Reg. at 38,427-29 (section titled "Implementation of New $PM_{2.5}$ NAAQS"). Nor did EPA thereafter overtly treat its "interim" $PM_{2.5}$ implementation policy as final when it promulgated the 2007 and 2008 Final $PM_{2.5}$ Implementation Rules challenged here. Accordingly, we conclude the petitioners' challenge is timely and proceed to EPA's substantive decision to implement the NAAQS under Subpart 1.

### *B.*

EPA contends that because Subpart 4 repeatedly refers to $PM_{10}$—rather than to $PM_{2.5}$ or "particulate matter" generally—the statutory language limits Subpart 4's applicability to implementation of the current $PM_{10}$ standard. Thus, by default, EPA contends, $PM_{2.5}$ must be implemented pursuant to the general (and less stringent[6]) implementation

---

[6]For example, (1) Subpart 4 requires a nonattainment area to be classified as "moderate" and upon failure to attain to be reclassified as "serious," 42 U.S.C. § 7513(a)-(c), while under Subpart 1, EPA "may" but is not required to classify a nonattainment area, *id.* § 7502(a)(1)(A); (2) under Subpart 4, a "serious" attainment date may be extended only once (for a maximum of 5 years) and only if the SIP includes the "most stringent measures" included in any state's SIP or achieved in any State and feasible for the area, *id.* § 7513(e), while Subpart 1 allows attainment date extensions of up to 10 years with no

procedure in Subpart 1. This argument ignores the plain meaning of the statute and the lesson of *Whitman*.

Before the Congress enacted Subpart 4, EPA had promulgated a single particulate matter standard—the $PM_{10}$ standard—which encompassed all particulate matter with a diameter of 10 micrometers or less—including both coarse and fine particulate matter, that is, particulate matter now governed by both the $PM_{10}$ and $PM_{2.5}$ standards—and the 1990 CAA amendments adopted this broad meaning in defining "$PM_{10}$." 1987 PM NAAQS Revisions, 52 Fed. Reg. at 24,639 ("The Administrator . . . has decided to replace [Total Suspended Particles] as the particle indicator for the primary standards with a new indicator that includes only those particles less than a nominal 10 [micrometers] in diameter. . . . In defining the standards for particulate matter, this new indicator is termed $PM_{10}$."); 42 U.S.C. § 7602(t) ("The term 'PM-10' means particulate matter with an aerodynamic diameter less than or equal to a nominal ten micrometers . . . ."). Thus, by its express terms, Subpart 4, when enacted, governed all $PM_{10}$ particles, including those now denominated $PM_{2.5}$. The scope of the statutory definition—and consequently of Subpart 4's application—did not change when EPA subdivided $PM_{10}$ by regulation. As the

---

"stringent measures" requirement therefor, *id*. § 7502(a)(2)(A); (3) Subpart 4 subjects a "serious" nonattainment area that fails to timely attain to a mandatory annual 5% pollutant reduction, *id*. § 7513a(d), while Subpart 1 includes no such requirement; (4) Subpart 4 requires that "reasonable available control measures" must be implemented within 4 years after designation, *id*. § 7513a(a)(1)(C), while Subpart 1 requires such measures be implemented "as expeditiously as practicable," *id*. § 7502(c)(1); and (5) Subpart 4 requires that best available control measures be implemented no later than 4 years after an area is classified or reclassified as "serious," *id*. § 7513a(b)(1)(B), while Subpart 1 has no best available control measures requirement.

*Whitman* Court made clear, the intent of the 1990 amendments was to limit the broad implementation discretion Subpart 1 had previously granted EPA. *Cf. Whitman*, 531 U.S. at 484 ("The principal distinction between Subpart 1 and Subpart 2 is that the latter eliminates regulatory discretion that the former allowed."). It makes no sense then that the Congress would have wanted EPA to relax Subpart 4's more stringent, nondiscretionary requirements for implementing the $PM_{2.5}$ standard at the same time EPA decided to strengthen the $PM_{2.5}$ standard itself based on "evidence from numerous health studies demonstrating that serious health effects are associated with exposures to elevated levels of $PM_{2.5}$." $PM_{2.5}$ Implementation Rule, 72 Fed. Reg. at 20,586; *see also id*. at 20,586-87 ("Epidemiological studies have shown statistically significant correlations between elevated $PM_{2.5}$ levels and premature mortality. Other important effects associated with $PM_{2.5}$ exposure include aggravation of respiratory and cardiovascular disease (as indicated by increased hospital admissions, emergency room visits, absences from school or work, and restricted activity days), changes in lung function and increased respiratory symptoms, as well as new evidence for more subtle indicators of cardiovascular health. Individuals particularly sensitive to $PM_{2.5}$ exposure include older adults, people with heart and lung disease, and children.").[7] Notwithstanding the plain

---

[7]The regulations' treatment of precursors provides a useful example of how the Agency has used Subpart 1 to establish a less stringent implementation regime than envisioned by Subpart 4. Ammonia is a precursor to fine particulate matter, making it a precursor to both $PM_{2.5}$ and $PM_{10}$. For a $PM_{10}$ nonattainment area governed by Subpart 4, a precursor is presumptively regulated. *See* 42 U.S.C. § 7513a(e). But under the $PM_{2.5}$ rules challenged here, the EPA established a rebuttable presumption against regulating ammonia unless a State or the EPA "provides an appropriate technical demonstration" that shows emissions from ammonia "significantly

meaning of the statutory language and the force of *Whitman*,[8] EPA offers several unconvincing arguments to support implementing the new PM$_{2.5}$ standard pursuant to Subpart 1 rather than Subpart 4.

First, EPA claims Subpart 4 "contains requirements that are expressly based upon the form of the PM$_{10}$ NAAQS." Br. of Resp't 31. This may be true but Subpart 4 also expressly governs implementation of the "PM-10" standard, *see* 42 U.S.C. §§ 7513-7513b, and the Act defines "PM-10" as "particulate matter with an aerodynamic diameter less than or

---

contribute to PM$_{2.5}$ concentration in the nonattainment area." 40 C.F.R. § 51.1002(c)(4)(i). When Congress enacted Subpart 4, it sought to end this administrative gamesmanship.

[8]EPA offers several grounds to distinguish *Whitman*—none of them persuasive. First EPA notes that the text of Subpart 2 refers generically to "ozone" while Subpart 4's text refers specifically to PM$_{10}$, EPA Br. 36—but Subpart 4's title refers generically to "Particulate Matter" and, as we have noted, when the 1990 amendments to the CAA were enacted, PM$_{10}$ included PM$_{2.5}$ under both the new statutory definition and the existing EPA definition. Second, EPA argues that Subpart 4's provisions do not "comprehensively prescribe[] classifications and attainment dates for *all* particulate matter nonattainment areas." Br. of Resp't 37 (emphasis in original). Subpart 4 may not be as comprehensive as Subpart 2 but its requirements are specific, more stringent and far less discretionary than Subpart 1. *See supra* note 6. Third, EPA contends that in contrast to *Whitman*, EPA's application of Subpart 1 to PM$_{2.5}$ does not render Subpart 4 "utterly nugatory" because Subpart 4 still applies to the remaining PM$_{10}$ standard. Br. of Resp't 37 (quoting *Whitman*, 531 U.S. at 484). But if EPA's interpretation stands, Subpart 4 will be "utterly nugatory" with respect to implementation of the PM$_{2.5}$ standard—notwithstanding the Congress expressly directed the standard applicable to all PM$_{10}$ particles, including PM$_{25}$, be regulated under Subpart 4.

equal to a nominal ten micrometers," 42 U.S.C. § 7602(t). Thus, under *Chevron* step 1, EPA must implement all standards applicable to $PM_{10}$—including its $PM_{2.5}$ standards—pursuant to Subpart 4.

Second, EPA urges that because in the 1987 PM NAAQS Revisions, it "had considered whether to establish a separate NAAQS for fine particles, using $PM_{2.5}$ as the indicator," the Congress should have foreseen that it might do so later. Br. of Resp't 32. It is not at all clear that the Congress should have so foreseen—EPA cites a single, vague footnote to support its claim the Congress was on notice such a change was likely. *Id*. at 32 (citing 52 Fed. Reg. at 24,639 n.2 ("Particles in ambient air usually occur in two somewhat overlapping size distributions, fine (diameter less than 2.5 [micrometers]) and coarse (diameter larger than 2.5 [micrometers]. The two size fractions tend to have different origins and composition." (staff document citation omitted)). But even were such notice clear, it does not follow that the Congress therefore intended that a separate $PM_{2.5}$ standard (if promulgated) be exempt from Subpart 4's requirements. As in *Whitman*, the possibility of such a change suggests only that gaps resulting therefrom might "prevent us from concluding that Congress clearly intended [the specific pollutant subpart] to be the *exclusive, permanent* means of enforcing a revised ozone standard in nonattainment areas." *Whitman*, 531 U.S. at 484 (emphasis added). It does not render "utterly nugatory" the restrictions that the 1990 amendments imposed on EPA's discretion in implementing the particulate matter standards for all particles 10 micrometers or less in diameter. *See id*. As the Supreme Court observed regarding Subpart 2, "[a] plan reaching so far into the future was not enacted to be abandoned the next time the EPA reviewed the [pollutant's] standard—which Congress knew could happen at any time." *Id*. at 485.

EPA also argues that the Congress "could have easily used the general term 'particulate matter,' rather than the specific term 'PM-10.' " Br. of Resp't 33. That the Congress could have done so does not negate the reality that the "$PM_{10}$" standard to which the Congress referred in fact included fine $PM_{2.5}$ (both under the 1987 Rule and the 1990 statutory definition).

In a final *Chevron* step 1 effort, EPA asserts that the legislative history makes the Congress's intent clear. Assuming legislative history could override the plain, unambiguous directive of Subpart 4, the history cited here is unconvincing. EPA relies on a single congressman's statement: " 'The Title I PM-10 provisions of H.R. 3030 somewhat reschedule the attainment dates that would otherwise apply under the PM-10 standards as promulgated by EPA.' " Br. of Resp't 39 (quoting *A Legislative History of the Clean Air Act Amendments of 1990*, at 2996 (Comm. Print 1993) (statement of Rep. John Murtha)). This statement avails EPA nought. "[P]utting to one side the fact that this was the statement of a single [member of Congress], . . . it is not necessarily inconsistent with" the petitioners' view that Subpart 4 continues to apply to $PM_{2.5}$ standards. *See Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 474 (D.C. Cir. 1998). At the time the statement was uttered, "the PM-10 standards as promulgated by EPA" applied to *all* particulate matter having a diameter equal to or less than 10 micrometers—including what is now denominated $PM_{2.5}$.[9]

---

[9]Moreover, "judges must exercise extreme caution before concluding that a statement made in floor debate, or at a hearing, or printed in a committee document may be taken as statutory gospel, in light of the endemic interplay, in Congress, of political and legislative considerations likely unrelated to the interpretive tasks of a court." *Tex. Mun. Power Agency v. EPA*, 89 F.3d 858, 875 (D.C. Cir. 1996) (per curiam) (quotation marks and alterations omitted). Here, it is

*See* 1987 PM NAAQS Revisions, 52 Fed. Reg. at 24,639.

EPA additionally argues that its "reading of the act is, at minimum, a 'permissible' interpretation entitled to deference under *Chevron* step two." Br. of Resp't 41 (upper case lowered). This argument is foreclosed, however, under *Chevron* step 1 because the statute is plain on its face.

For the foregoing reasons, we grant the petitions for review of the Final Clean Air Fine Particle Implementation Rule, 72 Fed. Reg. 20,586 (Apr. 25, 2007), and the Implementation of the New Source Review (NSR) Program for Particulate Matter Less Than 2.5 Micrometers ($PM_{2.5}$), 73 Fed. Reg. 28,321 (May 16, 2008). We remand to EPA to re-promulgate these rules pursuant to Subpart 4 consistent with this opinion.[10]

*So ordered*.

---

hard to ignore "the irony that [EPA] points to the *same* floor statement that the [petitioners] contend[] supports [their] opposite view." *Grand Canyon Air Tour Coal.*, 154 F.3d at 474 (emphasis in original).

[10]In light of our disposition, we need not address the petitioners' challenge to the presumptions in 40 C.F.R. § 51.1002(c)(3)-(4) that volatile organic compounds and ammonia are not $PM_{2.5}$ precursors as Subpart 4 expressly governs precursor presumptions. *See* 42 U.S.C. § 7513a(e). Moreover, we decline the petitioners' invitation to set a deadline for EPA upon remand or to retain jurisdiction pending such action. *See Natural Res. Def. Council v. EPA*, 489 F.3d 1364, 1375 (D.C. Cir. 2007) ("We decline to set a two year limit on EPA's proceedings on remand as the NRDC requests; mandamus affords a remedy for undue delay."); *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (per curiam) (declining invitation to "impose a definitive deadline by which EPA must correct [clean air rule's] flaws" and reminding petitioners of availability of mandamus).