# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 14, 2013        Decided April 23, 2013

No. 12-5150

MINGO LOGAN COAL COMPANY,
APPELLEE

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00541)

———

*Matthew Littleton*, Attorney, United States Department of Justice, argued the cause for the appellant. *Aaron P. Avila*, *Mark R. Haag*, *Cynthia J. Morris* and *Kenneth C. Amaditz*, Attorneys, United States Department of Justice, and *Stefania D. Shamet*, Attorney, United States Environmental Protection Agency, were on brief.

*Emma C. Cheuse*, *Jennifer C. Chavez* and *Benjamin A. Luckett* were on brief for *amici curiae* West Virginia Highland Conservancy et al. in support of the appellant.

*Robert M. Rolfe* argued the cause for the appellee. *George P. Sibley III*, *Virginia S. Albrecht* and *Deidre G. Duncan* were on brief.

*Kathryn Kusske Floyd* and *Jay C. Johnson* were on brief for *amici curiae* Chamber of Commerce of the United States of America et al. in support of the appellee.

*Michael A. Carvin* and *Kevin P. Holewinski* were on brief for *amicus curiae* United Company in support of the appellee.

*Benjamin L. Bailey* and *Michael B. Hissam* were on brief for *amicus curiae Randy Huffman* in support of the appellee. *Thanos Basdekis* entered an appearance.

Before: HENDERSON, GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The Mingo Logan Coal Company (Mingo Logan) applied to the United States Army Corps of Engineers (Corps) for a permit under section 404 of the Clean Water Act (CWA), 33 U.S.C. § 1344, to discharge dredged or fill material from a mountain-top coal mine in West Virginia into three streams and their tributaries. The Corps—acting on behalf of the Secretary of the Army (Secretary) and without objection from the Administrator of the United States Environmental Protection Agency (Administrator, EPA), who has "veto" authority over discharge site selection under CWA subsection 404(c), 33 U.S.C. § 1344(c)—issued the permit to Mingo Logan, approving the requested disposal sites for the discharged material. Four years later, EPA invoked its subsection 404(c) authority to "withdraw" the specifications of two of the streams as disposal sites, thereby prohibiting Mingo Logan from discharging into them. Mingo Logan filed this action challenging EPA's withdrawal of the specified sites on the grounds that (1) EPA lacks statutory authority to withdraw site specification after a permit has issued and (2) EPA's decision to do so was arbitrary and capricious in violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et*

*seq*. The district court granted summary judgment to Mingo Logan on the first ground without reaching the second. We reverse the district court, concluding that EPA has post-permit withdrawal authority, and remand for further proceedings.

## I.

The CWA provides that "the discharge of any pollutant by any person shall be unlawful" except as in compliance with specifically enumerated CWA provisions, including section 404.[1] 33 U.S.C. § 1311(a). Subsection 404(a) authorizes the Secretary to issue permits allowing discharge of dredged or fill material "at specified disposal sites," which are to be "specified for each such permit by the Secretary . . . through the application of guidelines developed by the Administrator, in conjunction with the Secretary." *Id.* § 1344(a), (b). The Secretary's authority to specify a disposal site is expressly made "[s]ubject to subsection (c) of [section 404]." *Id.* § 1344(b). Subsection 404(c) authorizes the Administrator, after consultation with the Corps, to veto the Corps's disposal site specification—that is, the Administrator "is authorized to prohibit the specification (including the withdrawal of

---

[1] Under the CWA, "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source," 33 U.S.C. § 1362(12); "pollutant," in turn, "means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water," *id.* § 1362(6). CWA section 404 authorizes the Secretary, acting through the Corps, to issue permits for the discharge of dredged and fill material, while section 402 authorizes EPA to issue permits for the discharge of other pollutants. *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 10 (D.C. Cir. 2011) (citing *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 461 n.1 (D.C. Cir. 2006)).

specification) of any defined area as a disposal site, and . . . to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site"—"whenever he determines" the discharge will have an "unacceptable adverse effect" on identified environmental resources. *Id*. § 1344(c).

In June 1999, Hobet Mining, Inc., Mingo Logan's predecessor, applied for a section 404 permit to discharge material from the Spruce No. 1 Mine into four West Virginia streams and their tributaries. In 2002, after the Corps prepared a draft Environmental Impact Statement, EPA expressed its concern that "even with the best practices, mountaintop mining yields significant and unavoidable environmental impacts that had not been adequately described in the document." Letter from EPA, Region III to Corps, Huntington Dist., at 1 (June 16, 2006) (JA 617). In the end, however, EPA declined to pursue a subsection 404(c) objection. Email from EPA to Corps (Nov. 2, 2006) (JA 982) ("[W]e have no intention of taking our Spruce Mine concerns any further from a Section 404 standpoint . . . ."). On January 22, 2007, the Corps issued Mingo Logan a section 404 permit, effective through December 31, 2031, which authorized Mingo Logan to dispose of material into three streams—Pigeonroost Branch, Oldhouse Branch and Seng Camp Creek—and certain tributaries thereto. Dep't of the Army Permit No. 199800436-3 (JA 984) (Spruce Mine Permit). The permit expressly advised that the Corps "may reevaluate its decision on the permit at any time the circumstances warrant" and that "[s]uch a reevaluation may result in a determination that it is appropriate to use the suspension, modification, and revocation procedures contained in 33 CFR 325.7." *Id*. at 3 (JA 986). The permit made no mention of any future EPA action.

On September 3, 2009, EPA wrote the Corps requesting it "use its discretionary authority provided by 33 CFR 325.7 to suspend, revoke or modify the permit issued authorizing Mingo Logan Coal Company to discharge dredged and/or fill material into waters of the United States in conjunction with the construction, operation, and reclamation of the Spruce Fork No. 1 Surface Mine," based on "new information and circumstances . . . which justif[ied] reconsideration of the permit." Letter from EPA, Region III to Corps, Huntington Dist., at 1 (Sept. 3, 2009) (JA 941). EPA noted in particular its "concern[] about the project's potential to degrade downstream water quality." *Id.* The Corps responded that there were "no factors that currently compell[ed it] to consider permit suspension, modification or revocation." Letter from Corps, Huntington Dist. to EPA, Region III, at 2 (Sept. 30, 2009) (JA 950). EPA wrote back: "We intend to issue a public notice of a proposed determination to restrict or prohibit the discharge of dredged and/or fill material at the Spruce No. 1 Mine project site consistent with our authority under Section 404(c) of the Clean Water Act and our regulations at 40 C.F.R. Part 231." Letter from EPA, Region III to Corps, Huntingdon Dist., at 1 (October 16, 2009) (Supp. JA 1).

EPA's Regional Director published the promised notice of proposed determination on April 2, 2010, requesting public comments "[p]ursuant to Section 404(c) . . . on its proposal to withdraw or restrict use of Seng Camp Creek, Pigeonroost Branch, Oldhouse Branch, and certain tributaries to those waters in Logan County, West Virginia to receive dredged and/or fill material in connection with construction of the Spruce No. 1 Surface Mine." Proposed Determination, 75 Fed. Reg. 16,788, 16,788 (Apr. 2, 2010). The Regional Director followed up with a Recommended Determination on September 24, 2010, limited to withdrawal of the specification of Pigeonroost Branch and Oldhouse Branch and

their tributaries. On January 13, 2011, EPA published its Final Determination, which, adopting the Regional Director's recommendation, formally "withdraws the specification of Pigeonroost Branch, Oldhouse Branch, and their tributaries, as described in [the Spruce Mine Permit] . . . as a disposal site for the discharge of dredged or fill material for the purpose of construction, operation, and reclamation of the Spruce No. 1 Surface Mine" and "prohibits the specification of the defined area . . . for use as a disposal site associated with future surface coal mining that would be expected to result in a nature and scale of adverse chemical, physical, and biological effects similar to the Spruce No. 1 mine." Final Determination of the Assistant Administrator for Water Pursuant to Section 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, WV, 76 Fed. Reg. 3126, 3128 (Jan. 19, 2011).

Mingo Logan filed this action in district court immediately following the Proposed Determination, challenging EPA's authority to "revoke" the three-year-old permit, Compl., ¶ 75, *Mingo Logan Coal Co. v. U.S. EPA*, C.A. No. 10-00541 (D.D.C. Apr. 2, 2010), and amended its complaint in February 2011 to challenge the Final Determination, asserting it is both ultra vires and arbitrary and capricious. Am. Compl., *Mingo Logan Coal* (Feb. 28, 2011).

On cross-motions for summary judgment, the district court granted judgment to Mingo Logan on March 23, 2012. *Mingo Logan Coal Co. v. U.S. EPA*, 850 F. Supp. 2d 133 (D.D.C. 2012). The court concluded EPA "exceeded its authority under section 404(c) of the Clean Water Act when it attempted to invalidate an existing permit by withdrawing the specification of certain areas as disposal sites after a permit had been issued by the Corps under section 404(a)." *Id*. at 134. The United States filed a timely notice of appeal on

behalf of EPA. The Corps joined EPA on brief. *See* Appellant Br. & Reply Br.

## II.

In granting summary judgment, the district court agreed with Mingo Logan's interpretation of subsection 404 to preclude EPA from withdrawing a site specification once the Corps has issued a permit. "We review a grant of summary judgment *de novo* applying the same standards as those that govern the district court's determination." *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997). "Moreover, insofar as the agency's determination amounts to or involves its interpretation of . . . a statute entrusted to its administration, we review that interpretation under the deferential standard of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Id.* Under *Chevron*:

> We first ask "whether Congress has directly spoken to the precise question at issue," in which case we "must give effect to the unambiguously expressed intent of Congress." If the "statute is silent or ambiguous with respect to the specific issue," however, we move to the second step and defer to the agency's interpretation as long as it is "based on a permissible construction of the statute."

*Natural Res. Def. Council v. EPA*, 706 F.3d 428, 431 (D.C. Cir. 2013) (quoting *Chevron*, 467 U.S. at 842–43). We construe subsection 404(c) under *Chevron* step 1 because we believe the language unambiguously expresses the intent of the Congress.

As noted earlier, *see supra* p. 3, section 404 vests the Corps, rather than EPA, with the authority to issue permits to discharge fill and dredged material into navigable waters and to specify the disposal sites therefor. *See* 33 U.S.C. § 1344(a)-(b); *see Senate Consideration of the Report of the Conference*

*Committee*, 1 *A Legislative History of the Water Pollution Control Act Amendments of 1972* (Legislative History) 161, 177 (Jan. 1973) (Statement of Sen. Edmund Muskie, 118 Cong. Rec. at 33,699 (Oct. 4, 1972)) (Senate Committee "had reported a bill which treated the disposal of dredged spoil like any other pollutant" but Conference Committee adopted provisions of House bill that "designated the Secretary of the Army rather than the Administrator of the Environmental Protection Agency as the permit issuing authority"). Nonetheless, the Congress granted EPA a broad environmental "backstop" authority over the Secretary's discharge site selection in subsection 404(c), which provides in full:

> (c) Denial or restriction of use of defined areas as disposal sites
>
> The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

33 U.S.C. § 1344(c); *see* Legislative History at 177 ("[T]he Conferees agreed that the Administrator . . . should have the veto over the selection of the site for dredged spoil disposal

and over any specific spoil to be disposed of in any selected site.").[2]   Section 404 imposes no temporal limit on the Administrator's authority to withdraw the Corps's specification but instead expressly empowers him to prohibit, restrict or withdraw the specification "*whenever*" he makes a determination that the statutory "unacceptable adverse effect" will result.  33 U.S.C. § 1344(c) (emphasis added).  Using the expansive conjunction "whenever," the Congress made plain its intent to grant the Administrator authority to prohibit/deny/restrict/withdraw a specification at *any* time.

[2]Thus, subsection 404(c) affords EPA two distinct (if overlapping) powers to veto the Corps's specification: EPA may (1) "prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site" or (2) "deny or restrict the use of any defined area for specification (including the withdrawal of specification)."  In withdrawing the specifications here, EPA did not clearly distinguish between the two powers.  *See* Final Determination, 76 Fed. Reg. at 3127 ("EPA Region III published in the Federal Register a Proposed Determination to prohibit, restrict, or deny the specification or the use for specification (including withdrawal of specification) of certain waters at the project site as disposal sites for the discharge of dredged or fill material for the construction of the Spruce No. 1 Surface Mine.").  It appears, however, that EPA exercised the first authority—"to prohibit"/"withdraw[]"—given the post-permit timing.  *See id.* at 3128 ("EPA's Final Determination withdraws the specification of Pigeonroost Branch, Oldhouse Branch, and their tributaries, as described in DA Permit No. 199800436-3 (Section 10: Coal River), as a disposal site for the discharge of dredged or fill material for the purpose of construction, operation, and reclamation of the Spruce No. 1 Surface Mine. This Final Determination also prohibits the specification of the defined area constituting Pigeonroost Branch, Oldhouse Branch, and their tributaries for use as a disposal site associated with future surface coal mining that would be expected to result in a nature and scale of adverse chemical, physical, and biological effects similar to the Spruce No. 1 mine.").

*See* 20 Oxford English Dictionary 210 (2d ed.1989) (defining "whenever," used in "a qualifying (conditional) clause," as: "At whatever time, no matter when."). Thus, the unambiguous language of subsection 404(c) manifests the Congress's intent to confer on EPA a broad veto power extending beyond the permit issuance.[3] This construction is further buttressed by subsection 404(c)'s authorization of a "withdrawal" which, as EPA notes, is "a term of retrospective application." Appellant Br. 27. EPA can *withdraw* a specification only after it has been made. *See* 20 Oxford English Dictionary 449 (2d ed.1989) (defining "withdraw" as "[t]o take back or away (something that has been given, granted, allowed, possessed, enjoyed, or experienced)"). Moreover, because the Corps often specifies final disposal sites in the permit itself—at least it did here, *see* Spruce Mine Permit at 1 ("You are authorized to perform work in accordance with the terms and conditions *specified* below . . . .") (emphasis added) (JA 984)—EPA's power to withdraw can *only* be exercised post-permit. Mingo Logan's reading of the statute would eliminate EPA's express statutory right to withdraw a specification and thereby render

---

[3]Based on the plain meaning of the statutory language, EPA has consistently maintained this interpretation for over thirty years. *See* Section 404(c) Procedures, 44 Fed. Reg. 58,076, 58,077 (Oct. 9, 1979) ("The statute on its face clearly allows EPA to act after the Corps has issued a permit; it refers twice to the 'withdrawal of specification,' which clearly refers to action by EPA after the Corps has specified a site (e.g. issued a permit or authorized its own work)."); Final Determination of the Administrator Concerning the North Miami Landfill Site Pursuant to Section 404(c) of the Clean Water Act at 1-2 (Jan. 26, 1981) (JA 239-40) (exercising 404(c) authority "to restrict the use of [of the North Miami Landfill] for specification (including the withdrawal of specification) as a disposal site" almost five years after Corps issued permit therefor). The Corps has made clear by joining EPA in this litigation that it agrees with EPA's interpretation. *See supra* p. 7.

subsection 404(c)'s parenthetical "withdrawal" language superfluous—a result to be avoided. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (applying "one of the most basic interpretative canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (brackets and quotation marks omitted).

Notwithstanding the unambiguous statutory language, Mingo Logan presses its own view of the language, the statutory structure and section 404's legislative history to maintain that the Congress intended to preclude post-permit withdrawal. We find none of its arguments persuasive.

First, Mingo Logan argues that the statutory language itself contemplates that specification occurs before (rather than when) the permit issues and therefore *can* (and must) be withdrawn pre-permit. We find no such intent in the statutory directive Mingo Logan quotes—that "each such disposal site shall be specified for each such permit by the Secretary . . . through the application of guidelines developed by the Administrator, in conjunction with the Secretary." 33 U.S.C. § 1344(b). This language is at least as consistent with specification by the Corps at the time the permit issues as it is with pre-permit specification. Moreover, as noted earlier, *see supra* p. 10, the Corps expressly "specified" the final sites in the Spruce Mine Permit itself. Nor does the permitting process—including the "extensive coordination process during which EPA can review the Corps's statement of findings/record of decision," Appellee Br. 31—require that the specification be made before the permit issues. During the permitting process, the disposal sites are proposed, reviewed—perhaps even "specified," as Mingo Logan contends—but the final specifications are included in the permit itself.

Second, Mingo Logan asserts EPA's interpretation conflicts with section 404 "as a whole." *Id*. at 35. Mingo Logan claims, for example, that "EPA's reading obliterates the choice Congress made to give the permitting authority with all of its attributes to the Corps, not EPA." *Id*. at 36. While it is true that subsections 404(a)-(b) unambiguously authorize the Secretary to issue a discharge permit—and to specify the disposal site(s) therefor—section 404(b) makes equally clear, as explained *supra pp.* 8-11, that the Administrator has, in effect, the *final* say on the specified disposal sites "whenever" he makes the statutorily required "unacceptable adverse effect" determination. Thus, insofar as site specification may be considered, as Mingo Logan asserts, an "attribute[]" of the permitting authority, the statute expressly vests final authority over this particular attribute in the Administrator.

Mingo Logan also contends that EPA's interpretation "tramples on provisions like sections 404(p) and 404(q) that are intended to give permits certainty and finality." Appellee Br. 36. Subsection 404(p) provides: "Compliance with a permit issued pursuant to [section 404], including any activity carried out pursuant to a general permit issued under this section, shall be deemed compliance, for purposes of [enforcement actions brought under] sections 1319 and 1365 of [title 33] . . . ." 33 U.S.C. § 1344(p).[4] According to Mingo Logan, "absent . . . permit violations or public interest considerations, the permittee can rely on the permit shield of section 404(p)." Appellee Br. 37. But again, section 404(c)'s language is plain with regard to its enumerated "unacceptable adverse effects": the Administrator retains authority to

---

[4]Sections 1319 and 1365 of title 33 authorize an action by, respectively, (1) EPA against a violator of, inter alia, the terms of a section 404 permit; and (2) a citizen against a violator of a CWA effluent limitation or against EPA for failure to perform a non-discretionary "act or duty" under the CWA. 33 U.S.C. §§ 1319, 1365.

13

withdraw a specified disposal site "whenever" he determines such effects will result from discharges at the sites. And when he withdraws a disposal site specification, as he did here, the disposal site's "terms and conditions specified" in the permit, *see* Spruce Mine Permit at 1 (JA 984), are in effect amended so that discharges at the previously specified disposal sites are no longer in "[c]ompliance with" the permit—although the permit itself remains otherwise in effect to the extent it is usable.[5] Moreover, as EPA notes, subsection 404(c) was enacted in 1972 and its plain meaning did not change when 404(p) was enacted five years later. Appellant Br. 33-34. As Mingo Logan acknowledges, if "the text of section 404(c) clearly and unambiguously gave EPA the power to act post-permit"—a reading it rejects—then section 404(p) "cannot be read to implicitly overturn section 404(c)." Appellee Br. 39 (citing Appellant Br. at 34 (citing *Vill. of Barrington, Ill. v. STB*, 636 F.3d 650, 662 (D.C. Cir. 2011))). As we have repeatedly stated throughout this opinion, the text of section 404(c) does indeed clearly and unambiguously give EPA the power to act post-permit. Thus, subsection 404(p) does not implicitly limit section 404(c)'s scope. Nor does EPA's express statutory authority to act *post*-permit interfere with subsection 404(q)'s directive that the Secretary enter into

---

[5]In this case for example, EPA left intact the specification as disposal site of "the Right Fork of Seng Camp Creek and its tributaries . . . in part because some of those discharges have already occurred and because the stream resources in Right Fork of Seng Camp Creek were subject to a higher level of historic and ongoing human disturbance than those found in Pigeonroost Branch or Oldhouse Branch." Final Determination, 76 Fed. Reg. at 3127 n.1.

In addition, EPA has made clear that a permittee may not be penalized for discharges that occurred in compliance with the permit before the effective date of the withdrawal of the specification.

agreements with other agency heads "to minimize, to the maximum extent practicable, duplication, needless paperwork, and delays *in the issuance of permits* under this section" and "to assure that, to the maximum extent practicable, a decision *with respect to an application for a permit* under subsection (a) of this section will be made not later than the ninetieth day after the date the notice for such application is published under subsection (a) of this section." 33 U.S.C. § 1344(q) (emphases added). The enumerated obligations apply only *pre*-permit and are therefore unaffected by EPA's post-permit actions.

Finally, Mingo Logan argues that the legislative history "confirms that Congress intended EPA to act under section 404(c), if at all, prior to permit issuance." Appellee Br. 42. In particular, it relies on the statement of then-Senator Edmund Muskie that

> *prior to* the issuance of any permit to dispose of spoil, the Administrator must determine that the material to be disposed of will not adversely affect municipal water supplies, shellfish beds, and fishery areas (including spawning and breeding areas), wildlife or recreational areas in the specified site. Should the Administrator so determine, no permit may issue.

118 Cong. Rec. at 33,699, *reprinted in* Legislative History at 177 (emphasis added). "Assuming legislative history could override the plain, unambiguous directive" of section 404(c) and "putting to one side the fact that this was the statement of a single member of Congress," the quoted language is "not necessarily inconsistent with" EPA's interpretation. *See Natural Res. Def. Council v. EPA*, 706 F.3d 428, 437 (D.C. Cir. 2013) (quotation marks and brackets omitted); *see also Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 752 (2012) ("[T]he views of a single legislator, even a bill's sponsor, are not controlling."). That EPA should review the preliminary specifications *pre*-permit to determine whether discharges will

have the required "unacceptable adverse effect"—as EPA in fact did here—does not mean it is foreclosed from doing so *post*-permit as well—as it also did here.[6] "Thus, 'this case does not present the very rare situation where the legislative history of a statute is more probative of congressional intent than the plain text.' " *Va. Dep't of Med. Assistance Servs. v. U.S. Dep't of Health & Human Servs.*, 678 F.3d 918, 923 (D.C. Cir. 2012) (quoting *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003)) (brackets omitted).

For the foregoing reasons, we reverse the district court insofar as it held that EPA lacks statutory authority under CWA section 404(c) to withdraw a disposal site specification post-permit. Because the district court did not address the merits of Mingo Logan's APA challenge to the Final Determination and resolution of the issue is not clear on the present record, we follow our ususal practice and remand the issue to the district court to address in the first instance. *See Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 n.* (D.C. Cir. 2012) (citing *Piersall v. Winter*, 435 F.3d 319, 325 (D.C. Cir. 2006)).

*So ordered*.

---

[6]Similarly, post-permit withdrawal is not precluded by 33 C.F.R. § 323.6(b) ("The Corps will not issue a permit where the regional administrator of EPA has notified the district engineer and applicant in writing pursuant to 40 CFR 231.3(a)(1) that he intends to issue a public notice of a proposed determination to prohibit or withdraw the specification, or to deny, restrict or withdraw the use for specification, of any defined area as a disposal site in accordance with section 404(c) of the Clean Water Act.").