Dissenting opinion filed by Circuit Judge KAVANAUGH.
KAREN LECRAFT HENDERSON, Circuit Judge:
In 2007, the United States Army Corps of Engineers (Corps) issued Mingo Logan Coal Co. (Mingo Logan) a permit to excavate the tops of several West Virginia mountains, extract exposed coal and dispose of the excess soil and rock in three surrounding valleys containing streams. Four years later, after additional study, the United States Environmental Protection Agency (EPA) decided that the project would result in “unacceptable adverse effeet[s]” to the environment. See 33 U.S.C. § 1344(c). The EPA therefore withdrew approval from two of the disposal sites, which together “make up roughly eighty eight percent of the total discharge area authorized by the permit.” Mingo Logan Coal Co. v. EPA (Mingo Logan I), 850 F.Supp.2d 133, 137 (D.D.C. 2012). In 2013, Mingo Logan challenged the EPA’s statutory authority to withdraw the two sites from the Corps permit after it had been issued but we determined that the Clean Water Act (CWA) authorized the EPA to do so. See Mingo Logan Coal Co. v. EPA (Mingo Logan II), 714 F.3d 608, 616 (D.C. Cir. 2013). We then remanded the case to the district court to consider Mingo Logan’s remaining Administrative Procedure Act (APA) challenges. See id. The district court thereafter rejected them. See Mingo Logan Coal Co. v. EPA (Mingo Logan III), 70 F.Supp.3d 151, 183 (D.D.C. 2014).
Mingo Logan now appeals the district court’s resolution of its APA claims. Specifically, the company argues that the EPA failed to engage in reasoned decisionmak-ing by ignoring Mingo Logan’s rebanee on the initial permit, impermissibly considering the effects of downstream water quality and failing to explain adequately why the project’s environmental effects were so unacceptable as to justify ■withdrawal. We conclude that the EPA did not violate the APA in withdrawing specification of certain disposal areas from the permit; rather, it considered the relevant factors and adequately explained its decision. The EPA’s ex post withdrawal is a product of its broad veto authority under the CWA, not a procedural defect. Accordingly, we affirm.
I.
A. Statutory and Regulatory Background
Under the CWA, 33 U.S.C. §§ 1251 et seq., a party must generally obtain a permit from the relevant state and/or federal authority before discharging “any pollu *714 tant” into “navigable waters.”[1] See id. §§ 1311(a), 1341-45. Two categories of permits are involved in this case: a permit for the discharge of “dredged or fill material” under section 404 of the Act, see id. § 1344, and a permit for the discharge of all other pollutants under section 402, see id. § 1342.
1. Section 404
Under section 404, the Corps and qualified states are authorized to issue permits allowing “the discharge of dredged or fill material” into bodies of water “at specified disposal sites.” Id. § 1344(a), (g). The permit is required if, as here, a permit applicant plans to remove soil or rock from one location (i.e., “fill material”[2]) and dispose of it into “navigable waters.” See id. § 1344(a). The Corps specifies sites for disposal of dredge-and-fill material in accordance with so-called 404(b) Guidelines it has developed jointly with the EPA. See id. § 1344(b). Once the Corps has issued a 404 permit, it retains discretion to “modify, suspend, or revoke” it. 33 C.F.R. § 325.7(a). “Among the factors to be considered” by the Corps in making a revocation decision are:
the extent of the permittee’s compliance with the terms and conditions of the permit; whether or not circumstances relating to the authorized activity have changed since the permit was issued or extended, and the continuing adequacy of or need for the permit conditions; any significant objections to the authorized activity which were not earlier considered; revisions to applicable statutory and/or regulatory authorities; and the extent to which modification, suspension, or other action would adversely affect plans, investments and actions the per-mittee has reasonably made or taken in reliance on the permit.

Id.

Although the EPA does not issue the 404 permit directly, it has “a broad environmental ‘backstop’ authority over the [Corps’s] discharge site selection.” Mingo Logan II, 714 F.3d at 612. Specifically, under section 404(c), the EPA may “deny,” “restrict” or “withdrawn” specification of a site for disposal of dredge-and-fill material. 33 U.S.C. § 1344(c). The EPA is authorized to exercise this authority “whenever [the EPA Administrator] determines, after notice and opportunity for public hearings, that the discharge of such materials into such area [specified for disposal] will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.” Id. (emphasis added). In Mingo Logan II, we held that the EPA could exercise this “backstop” authority both pre-permit and post-permit; that is, the EPA may prevent the Corps from issuing a 404 permit specifying a disposal site or it may withdraw specification of a disposal site after the Corps has issued a permit. Mingo Logan II, 714 F.3d at 612-14, 616.
EPA regulations further define the adverse environmental effects the Administrator must identify before stepping in to deny, restrict or withdraw a 404 permit. Specifically, the EPA has interpreted “un *715 acceptable adverse effect” to mean an “impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas.” 40 C.F.R. § 231.2(e) (emphases added). When the EPA restricts or withdraws areas specified for disposal in a validly issued permit, the entire permit is not necessarily invalidated; rather, the permit is “in effect amended so that discharges at the previously specified disposal sites are no longer in ‘[c]ompliance with’ the permit.” Mingo Logan II, 714 F.3d at 615 (alteration in original) (quoting 33 U.S.C. § 1344(p)). Thus, to the extent a site passes EPA muster, the per-mittee may continue to dispose of dredge- and-fill material thereat. See id. at 615 & n. 5.
2. Section 402
Section 402 of the CWA establishes a separate permitting scheme, called the National Pollutant Discharge Elimination System (NPDES), under which the EPA is authorized to issue a permit for the discharge of all pollutants other than dredge- and-fill material. See 33 U.S.C. § 1342(a); see also Coeur Alaska, Inc. v. Se. Alaska Conservation Council, 557 U.S. 261, 273, 129 S.Ct. 2458, 174 L.Ed.2d 193 (2009). Alternatively, a state may assume authority for issuing a NPDES permit “for discharges into navigable waters within its jurisdiction.” 33 U.S.C. § 1342(b). If a state submits a description of its planned permitting program to the EPA and its plan meets the relevant CWA criteria, the EPA “shall approve” the program. Id. The state then becomes responsible for issuing a NPDES permit for pollutant discharge, see id. and the federal NPDES permitting program is suspended for qualified waters within that state’s jurisdiction, see id. § 1342(c)(1).
The EPA, however, maintains an oversight role. It may “withdraw approval of [the state] program” if it determines that the program is not being administered in accordance with the CWA and the state takes no corrective action. See id. § 1342(c)(3). Further, a state must submit to the EPA a copy of each permit application it receives and must keep the EPA informed of the state’s consideration of the application. Id. § 1342(d)(1). The EPA, acting through its Administrator, may object to the issuance of a state NPDES permit within ninety days of receipt thereof and, if it does so, the state may not issue the permit. See id. § 1342(d)(2). If the state fails to revise the permit to comply with CWA guidelines and requirements, the EPA may issue a revised permit that complies with the CWA. See id. § 1342(d)(4). Importantly, “[o]nce a section 402 permit has been issued, it may only be modified by the entity that issued the permit.” Mingo Logan III, 70 F.Supp.3d at 155 (citing 40 C.F.R. §§ 122.2, 122.62, 124.5(c)).
B. Factual Background
In 1997, Hobet Mining, Inc., Mingo Logan’s predecessor, began the process of securing the various permits required for operation of the Spruce No. 1 Mine, a proposed large-scale surface mining operation in West Virginia. Mingo Logan planned to use a surface-mining technique known as mountaintop mining at Spruce No. 1, whereby large swathes of land are removed from the surface, exposing coal deposits underneath. See generally Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 186 (4th Cir. 2009). The excess soil and rock (“spoil” or “overburden”) is then relocated to adjacent valleys, “creating a ‘valley fill’ that buries intermittent and perennial streams in the process.” *716 Id. Runoff water from the valley fill is collected in sediment ponds, where sediment suspended in the runoff water is allowed to settle. Id. The water collected in the ponds is then treated and discharged back into natural streams. Id.
Mingo Logan’s final proposal for the mine designated three sites for disposal of spoil, resulting in the burial of approximately 7.48 miles of three streams: (1) Seng Camp Creek; (2) Pigeonroost Branch; and (3) Oldhouse Branch. Because the streams were also going to be affected by the discharge of treated water, the project required both a 404 permit from the Corps for disposal of the spoil and an NPDES permit from West Virginia, which had secured an EPA-approved permitting plan under section 402.
Hobet Mining initiated the application process for a NPDES permit from West Virginia’s Department of Environmental Protection (WVDEP) in late 1997. Consistent with its CWA obligations, WVDEP notified the EPA of the application and forwarded it a proposed permit. The EPA initially objected but, after WVDEP placed additional conditions on the NPDES permit, the EPA withdrew its objections in December 1998 and approved the modified permit in January 1999. West Virginia thus issued a valid NPDES permit to Ho-bet Mining on January 11, 1999. The permit was modified in 2003 and 2005, which modifications were eventually approved by the EPA. The NPDES permit has since been renewed and remains in effect.
The 404 permitting process was much more extensive. Hobet Mining first applied to the Corps for an individual 404 permit in 1999, triggering a lengthy review process. After a seven-year consultation with Mingo Logan, the EPA and West Virginia, the Corps produced a 1600-page draft Environmental Impact Statement (EIS) on March 31, 2006. Although the EPA “expressed its concern that ‘even with the best practices, mountaintop mining yields significant and unavoidable environmental impacts that had not been adequately described in the document,’ ” Mingo Logan II, 714 F.3d at 610 (quoting Letter from EPA, Region III to Corps, Huntington Dist., at 1 (June 16, 2006)), it ultimately “declined to pursue a[n] ... objection” to the issuance of a 404 permit, id. Specifically, in an email, William Hoffman, Director of the EPA Office of Environmental Programs, told the Corps that it “ha[d] no intention of taking [its] Spruce Mine concerns any further from a Section 404 standpoint.” E-mail from EPA to Corps (Nov. 2, 2006), Joint App’x (J.A.) 292. On January 22, 2007, the Corps issued the 404 permit allowing the disposal of spoil into the three specified stream areas.
Mingo Logan’s 404 permit was almost immediately challenged in court by environmental groups, which added the permit to ongoing litigation challenging other coal-mining permits. See Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng’rs (OVEC), 243 F.R.D. 253, 255, 257 (S.D.W.Va. 2007).[3] Pursuant to an agreement it reached with the environmental plaintiffs, Mingo Logan began operations at the Spruce Mine in 2007 but limited its disposal of spoil to a single valley fill — the Seng Camp Creek disposal site. The other two disposal sites — Pigeonroost Branch and Oldhouse Branch — remained unused.
*717 On September 3, 2009, the EPA stepped in. It requested that the Corps use its discretionary authority to suspend, revoke or modify the permit based on “new information and circumstances” that “justified] reconsideration of the permit.” Letter from EPA, Region III to Corps, Huntington Dist., at 1 (Sept. 3, 2009), J.A. 309. The Corps sought comment from Mingo Logan and West Virginia; both opposed revoking, suspending or modifying the permit and asserted that the EPA’s concerns were not based on new information. The Corps rejected the EPA request on September 30, 2009. After addressing each of the EPA’s concerns, the Corps “determined that no additional evaluation of the project’s effects on the environment are warranted, the permit will not be suspended, modified or revoked, and a supplemental EIS will not be prepared.” Letter from Corps, Huntington Dist. to EPA, Region III, at 4 (Sept. 30, 2009), J.A. 331.
In response, on April 2, 2010, the EPA intervened directly. Invoking its veto authority under section 404(c), the EPA published a Proposed Determination withdrawing the 404 permit specification of the (as yet unused) Pigeonroost and Oldhouse Branch disposal sites. These disposal sites together amounted to approximately eighty-eight per cent of the area the original permit allowed for valley fills.[4] See Mingo Logan I, 850 F.Supp.2d at 137. After holding a public hearing and receiving comments, the EPA ultimately issued a Final Determination on January 13, 2011, withdrawing specification of the two disposal sites.
The EPA gave two primary reasons for its withdrawal: (1) the “unacceptable adverse impacts” resulting from “direct impacts to wildlife and wildlife habitat” in each area where the fill was in fact to occur (the fill “footprint”), see Final Determination of the U.S. Environmental Protection Agency Pursuant to § 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, West Virginia (Final Determination), at 47, 50 (Jan. 13, 2011); and (2) the “Unacceptable adverse impacts” on wildlife occurring “downstream of the footprint of the fills and sediment ponds,” id. at 50. As to the first basis, the EPA determined that “[t]he destruction of 6.6 miles of high quality stream habitat ..., and the subsequent loss of many populations of macroinverteb-rates, salamanders, fish and other wildlife dependent upon that aquatic habitat area for survival, ... will result in a loss of regional biodiversity and the broader ecosystem functions these populations provide.” Id. at 47. It cited specific concerns for each population described and, in view of its conclusion that the affected streams “are some of the last, rare and important high quality streams in the watershed,” it decided that the adverse effect on the local wildlife “is one that the aquatic ecosystem cannot afford.” Id. at 50. As for the adverse environmental impact downstream, the EPA concluded that removing the Pi-geonroost and Oldhouse Branches “as sources of freshwater dilution and converting them to sources of pollution” would increase water contamination and salinity, both producing a negative effect on various wildlife, including macroinvertebrates, salamanders, fish and water-dependent birds. Id. at 50, 60-73.
C. Procedural Background
Once the EPA issued its Final Determination, Mingo Logan filed suit in district *718 court, alleging that the EPA lacked statutory authority under the CWA to revoke a valid 404 permit after the Corps had issued it and that the EPA’s Final Determination was, for numerous reasons, arbitrary, capricious, or otherwise contrary to law in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706. See Mingo Logan III, 70 F.Supp.3d at 160. We resolved the first claim in Mingo Logan II, upholding the EPA’s authority under section 404(c) of the CWA to withdraw specification of spoil-disposal sites after the Corps had issued a 404 permit. See 714 F.3d at 616. We remanded the APA claim to the district court. Id.
On remand, the district court concluded that the EPA’s Final Determination complied with the APA. See Mingo Logan III, 70 F.Supp.3d at 154-55. It noted that both bases the EPA asserted for withdrawing the permit — the direct effects to wildlife within the valley fills’ footprint and the effects of the valley fills on downstream wildlife — independently supported its revocation decision, concluding that the EPA had not acted arbitrarily or capriciously in identifying “unacceptable adverse effect[s]” under both rationales. Id. at 175-76 (effects within the footprint); id. at 181—83 (downstream effects). Accordingly, it granted summary judgment to the EPA. Id. at 183. Mingo Logan now appeals. Our review is de novo. Murphy v. Exec. Office for U.S. Attorneys, 789 F.3d 204, 208 (D.C. Cir. 2015); see also Holland v. Nat’l Mining Ass’n, 309 F.3d 808, 814 (D.C.Cir.2002) (“[W]e review the administrative action directly, according no particular deference to the judgment of the District Court.”).
II.
The general legal principles attending our review are well-settled. The APA directs us to “set aside agency action” that is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A). Agency action is “arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency.” Motor Vehicle Mfrs. Ass’n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Although we must ensure that “an agency’s decreed result [is] within the scope of its lawful authority” and that “the process by which it reaches that result [is] logical and rational,” Michigan v. EPA, — U.S. -, 135 S.Ct. 2699, 2706, 192 L.Ed.2d 674 (2015) (quoting Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 374, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998)), we are “not to substitute [our] judgment for that of the agency,” State Farm, 463 U.S. at 43, 103 S.Ct. 2856. Whether we would have done what the agency did is immaterial; so long as the agency “examine[d] the relevant data and articulate[d] a satisfactory explanation for its actionf,] including a ‘rational connection between the facts found and the choice made,’ ” we will ordinarily uphold it. Id. (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).
When an agency changes policy, however, it must in some cases “provide a more detailed justification than what would suffice for a new policy created on a blank slate.” FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). Changing policy does not, on its own, trigger an especially “demanding burden of justification,” Ark Initiative v. Tidwell, 816 F.3d 119, 127 (D.C. Cir. 2016); indeed, the agency “need not demonstrate to a court’s satisfaction that *719 the reasons for the new policy are better than the reasons for the old one,” Fox, 556 U.S. at 515, 129 S.Ct. 1800 (emphasis in original). That said, if a “new policy rests upon factual findings that contradict those which underlay [an agency’s] prior policy,” the agency “must” provide “a more detailed justification” for its action. Id. The same is true if the agency’s “prior policy has engendered serious reliance interests that must be taken into account.” Id. In such cases, in order to offer “a satisfactory explanation” for its action, “including a rational connection between the facts found and the choice made,” State Farm, 463 U.S. at 48, 103 S.Ct. 2856 (internal quotation marks omitted), the agency must give “a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy,” Fox, 556 U.S. at 516, 129 S.Ct. 1800.
In this case, Mingo Logan claims that the EPA’s post-permit revocation is the epitome of arbitrary-and-capricious agency action. Not only did the EPA “entirely fail[] to consider an important aspect of the problem,” Mingo Logan claims, it also “relied on factors which Congress has not intended it to consider” and “offered an explanation for its decision that runs counter to the evidence.” See State Farm, 463 U.S. at 43, 103 S.Ct. 2856. This “rare and impressive trifecta,” Appellant’s Br. 4, is particularly egregious, Mingo Logan avers, given that the EPA was subject to Fox’s more detailed justification standard, see 556 U.S. at 515-16, 129 S.Ct. 1800. As Mingo Logan sees it, because the EPA did not veto the Spruce No. 1 permit the first time around, it must provide a weighty basis for withdrawing specification of two disposal sites four years later. We disagree with Mingo Logan’s assessment and address each prong of the alleged “trifecta” in turn.
A. EPA’s Consideration of Relevant Factors
Mingo Logan first argues that the EPA “entirely failed to consider an important aspect of the problem” — the costs Mingo Logan incurred in reliance on the permit and its history of compliance with the permit’s conditions. Appellant’s Br. 18-19 (quoting State Farm, 463 U.S. at 43, 103 S.Ct. 2856). As Mingo Logan sees it, the EPA may revoke a permit only if it balances resulting adverse environmental effects against the permittee’s sunk costs and record of permit compliance; “[i]n practice, that means that [the] EPA may withdraw a specification when circumstances have changed radically or when the withdrawal has only a minor impact on the operations envisioned (and reliance interests generated) by the permit.” Id. at 18. Because the EPA did not “balance” these “competing considerations,” see id. but instead based its decision only on the existence vel non of adverse environmental effects, Mingo Logan cries foul.
In response, the EPA concedes that it did not consider Mingo Logan’s reliance costs or its compliance history and, in its view, neither the CWA nor the APA requires it to do so. It contends, however, that we need not reach this issue because Mingo Logan failed to make the argument to the agency or to the district court and has thus forfeited it.
We agree with the EPA that the argument is forfeited and doubly so. “Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.” United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. *720 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952). Thus, “[a]s a general rule, claims not presented to [an] agency may not be made for the 'first time to a reviewing court.” Omnipoint Corp. v. FCC, 78 F.3d 620, 635 (D.C. Cir. 1996); see also Nat’l Wildlife Fed. v. EPA, 286 F.3d 554, 562 (D.C. Cir. 2002) (“It is well established that issues not raised in comments before the agency are waived and this Court will not consider them.”); Vill. of Barrington v. Surface Transp. Bd., 636 F.3d 650, 655 (D.C. Cir. 2011) (parties must “forcefully present! ] their arguments at the time appropriate under [agency] practice or else waive the right to raise those arguments on appeal” (alterations in original) (citations and internal quotation marks omitted)). The same rule applies on appeal from district court judgments. “Generally, an argument not made in the lower tribunal is deemed forfeited and will not be entertained [on appeal] absent exceptional circumstances.” Flynn v. Comm’r, 269 F.3d 1064, 1068-69 (D.C. Cir. 2001) (internal quotation marks omitted).
Here, Mingo Logan did not argue the reliance-costs and compliance-history issue before the EPA or in district court, notwithstanding numerous opportunities to do so. Indeed, the EPA’s process for finalizing its decision afforded Mingo Logan numerous chances to make the claim. The EPA first published a Proposed Determination detailing its environmental concerns in part as follows: “[C]onstruction of Spruce No. 1 Mine as authorized would destroy streams and habitat, cause significant degradation of on-site and downstream water quality, and could therefore result in unacceptable adverse impacts to wildlife and fishery resources.” Proposed Determination to Prohibit, Restrict, or Deny the Specification, or the Use for Specification (Including Withdrawal of Specification), of an Area as a Disposal Site; Spruce No. 1 Surface Mine, Logan County, WV, 75 Fed Reg. 16,788, 16,789 (Apr. 2, 2010). It then proposed to withdraw specification of the Pigeonroost and Oldhouse Branch sites, see id. at 16,805, and solicited comments on its proposal, see id. at 16,807-08, thereby providing Mingo Logan notice and an opportunity to put forward the factors that it believed the EPA was required to consider- — and had failed to consider — in reaching its initial conclusion.
Mingo Logan responded to the Proposed Determination with 172 pages of comments. Conspicuously absent therefrom, however, was any argument that the EPA had to balance the environmental effects against the costs Mingo Logan had incurred in reliance on the permit before reaching a final decision.[5] Equally absent was a detailing of these costs the EPA, under Mingo Logan’s theory, was required to consider. Indeed, other than a single reference in introductory factual material mentioning the “millions of dollars” Mingo Logan allegedly spent “preparing the *721 Spruce No. 1 site and commencing its operations” after the permit had issued, Min-go Logan never discussed what costs the EPA should consider or how those costs stacked up against the environmental concerns the EPA had identified. See Mingo Logan Coal Co., Comments in Response and in Opposition to the Proposed Determination 33 (June 3, 2010), J.A. 403. That a detailed statement of costs is missing here is unsurprising, of course — Mingo Logan never attempted to argue that the EPA was required to balance adverse effects against reliance costs in the first place.
After reviewing these and other comments on the Proposed Determination, an EPA Regional Director then published a Recommended Determination, again proposing to withdraw specification of the Pi-geonroost Branch and Oldhouse Branch sites and again inviting comments. See Recommended Determination of the U.S. Environmental Protection Agency Region III Pursuant to Section 404(c) of the Clean Water Act (Sept. 24, 2010). Yet again, other than a single reference in introductory material — “[n]ow, more than three years after the issuance of the permit, as Mingo Logan is actively mining the site in an attempt to recoup its decade-long investment, EPA has declared that the impacts that it had approved are now unacceptable, and seeks to revoke the permit,” Mingo Logan Coal. Co., Comments in Response and in Opposition to the Recommended Determination 2 (Nov. 29, 2010) — Mingo Logan never claimed that the EPA had to balance reliance costs against environmental effects[6] nor did it detail those costs. Accordingly, by failing to make the claim before the EPA, Mingo Logan forfeited it.
Once the EPA published its Final Determination withdrawing specification of the disposal sites, Mingo Logan filed suit, eventually composed of a fourteen-count amended complaint. None of the counts alleged that the EPA’s Final Determination was arbitrary and capricious because it had failed to weigh Mingo Logan’s reliance costs. Again, other than one general allegation in the factual background — that “[ajfter receiving its Permit, Mingo Logan spent millions of dollars preparing the site and commencing construction and operations,” Am. Compl. ¶ 141 — Mingo Logan did not assert an APA claim based on the EPA’s failure to consider its reliance costs.
After we decided Mingo Logan II, the case returned to the district court for consideration of the procedural issues. At the *722 district court’s request, Mingo Logan submitted a supplemental brief summarizing the issues remaining for review. In its brief, Mingo Logan asked the court to resolve “four key questions of law”:
(1) “Can [the] EPA ... base a section 404(c) decision on downstream water quality impacts that are regulated by West Virginia under section 402?”
(2) “Can [the] EPA base a section 404(c) determination on impacts, caused by mining features other than the discharges authorized by Mingo Logan’s section 404 permit?”
(3) “Assuming arguendo that [the] EPA can base its section 404(c) veto on downstream water effects regulated by section 402, can [the] EPA use water quality standards other than West Virginia’s duly-adopted water quality standards to determine whether such effects are ‘unacceptable’ within the meaning of section 404(c)?” and
(4) “After the Corps has issued a permit under section 404(a), can [the] EPA act under section 404(c) in the absence of substantial new information that was not available prior to the issuance of the permit?”
Supplemental Br. in Supp. of Mingo Logan’s Mot. for Summ. J. at 1-3, Mingo Logan III, 70 F.Supp.3d 151(No. 10-cv-541), ECF No. 99. Once the court resolved these four questions, according to Mingo Logan, it could move on to the fifth and final question warranting review:
(5) “Did [the] EPA demonstrate, based on substantial new information, that the discharges of fill material authorized by the Corps permit would cause ‘unacceptable adverse effects’ on wildlife?”
Id. at 3.
Conspicuously absent from this list — yet again — is the question Mingo Logan now presents for our review — whether the EPA’s failure to consider Mingo Logan’s reliance costs and compliance history renders its decision arbitrary and capricious. It is also worth noting, for good measure, that in an hours-long hearing on the procedural issues, covering over one hundred pages of transcript, Mingo Logan never once raised the reliance-costs claim to the district court. See generally Transcript of 7/30/14 Hearing, Mingo Logan III, 70 F.Supp.3d 151(No. 10-cv-541). Unsurprisingly, having never been presented with the question, the district court did not address it.
This record notwithstanding, the dissent disagrees with our conclusion that Mingo Logan forfeited its reliance-costs claim. Dissenting Op. at 737-38. Our disagreement, it seems, is attributable to two differences between us. First, he believes that merely mentioning the “millions of dollars” allegedly spent in reliance upon a permit is sufficient to preserve an argument that the EPA must weigh those reb-anee costs against environmental harms, see id. at 738-39, 740; we do not. But, as recently noted in Encino Motorcars, LLC v. Navarro, “[t]he extent to which [an agency] is obliged to address reliance will be affected by the thoroughness of public comments it receives on the issue.... An agency cannot be faulted for failing to discuss at length matters only cursorily raised before it.” — U.S. -, 136 S.Ct. 2117, 2128 n. 2, 195 L.Ed.2d 382 (2016) (Ginsburg, J., concurring). Our cases have likewise demanded that parties “forcefully present[ ]” their arguments to the agency to preserve them on appeal. Vill. of Barrington, 636 F.3d at 656. A handful of offhand references to “millions of dollars” primarily in introductory material — and never raised in the context of a claim that the EPA must balance these costs against the environmental effects it identified — is insufficient to preserve the claim Mingo Logan now pursues on appeal.
*723 Requiring a party to make a submission more detailed than “millions of dollars,” moreover, is not a triumph of form over function. Because Mingo Logan failed to detail its costs, the EPA could not have “consider[ed] and justified] the costs of revoking the permit” as our colleague would require. See Dissenting Op. at 739. Indeed, we do not quibble with his general premise — and that of the many legal luminaries he cites — that an agency should generally weigh the costs of its action against its benefits. See id. at 732-33. But, on Mingo Logan’s submission, the EPA would have to ask: Did Mingo Logan rely on the permit to the tune of two “millions of dollars” or two hundred “millions of dollars?” What portion of the “millions” would in fact be lost by withdrawing two disposal sites inasmuch as Mingo Logan can continue to discharge spoil at the Seng Camp Creek site and neither the Pigeonr-oost Branch site nor the Oldhouse Branch site had become operational yet? The EPA’s obligation is to engage in reasoned decisionmaking but Mingo Logan has an obligation to explain why it believes its reliance costs must be considered and to supply sufficient information about its costs to allow the EPA to consider them. “[Millions of dollars” is not enough.
In support of his view that Mingo Logan preserved its reliance-costs claim, our dissenting colleague cites a number of instances in the record where Mingo Logan asserted that the EPA should be subject to an explanatory standard for withdrawing a permit different from the standard for objecting to one initially. See id. at 738-39. In our view, this argument is distinct from Mingo Logan’s claim that reliance costs must be considered.' Because both arguments rely on language from Fox, it is tempting to conflate them. But there are important differences. In its reliance-costs argument, Mingo Logan claims that the EPA was required to balance the costs it incurred in reliance on the permit against the environmental concerns the EPA identified. As the dissent suggests, in that case the remedy would be to remand to the EPA to do the necessary balancing. See id. at 741. As discussed, the remedy informs in part our conclusion that Mingo Logan forfeited that argument because it failed to detail the costs in a way that the EPA could do what Mingo Logan now says it should do. See supra at 737-40.
Mingo Logan’s inadequate-explanation argument, in contrast, relies on Fox for a different argument. It claims that the EPA is subject to a heightened standard to justify its withdrawal decision and that, under that standard, the EPA’s explanation is insufficient. The remedy regarding this argument would be a remand to the EPA to better support revocation but the EPA could not balance reliance costs against environmental effects in doing so for the reasons already discussed. It would simply have to do a better job explaining why withdrawal was necessary in 2011 when it was not so in 2007. Like our colleague, we believe that Mingo Logan sufficiently pressed this argument before the EPA and in district court. Indeed, as the dissent points out, see Dissenting Op. at 738-39, Mingo Logan consistently argued that a different standard applied post-permit and that, accordingly, the EPA had to identify substantial new information to support its post-permit decision. Thus, this argument is properly before us and we address it (and reject it), see infra 726-30. But Mingo Logan’s post-permit heightened-standard claim does not preserve its reliance-costs claim. They are different claims supported by different arguments. Accordingly, having been forfeited not once, but twice (and perhaps thrice), we do not consider Mingo Logan’s *724 reliance-costs claim for the first time on appeal.[7]
B. EPA’s Reliance on Proper Factors
Mingo Logan’s second argument is that the EPA’s revocation decision was arbitrary and capricious because it “relied on [a] factor[] which Congress has not intended it to consider,” see State Farm, 463 U.S. at 43, 103 S.Ct. 2856 —water quality downstream from the valley fill. As mentioned, the EPA offered multiple bases for its decision in its Final Determination. It first identified adverse effects to wildlife within the footprint of the valley fills — that is, the area where the spoil was in fact to be disposed of. It then identified adverse effects to wildlife downstream from the fills attributable to increased levels of selenium and conductivity[8] in downstream water.
Mingo Logan argues that the EPA cannot rely on downstream water quality as a basis for finding adverse environmental effects. Because the “Congress has delegated responsibility for considering water quality to [West Virginia], not [the] EPA,” Appellant’s Br. 47, and West Virginia has granted Mingo Logan a section 402 permit that governs downstream water quality, Mingo Logan argues that the EPA has intruded upon West Virginia’s exclusive regulatory power over its “navigable waters,” see 33 U.S.C. § 1342(b). Mingo Logan also contends that the EPA imper-missibly applied its own water-quality standards in considering downstream effects. The application of such “ad hoc” standards, according to Mingo Logan, is arbitrary and capricious. Appellant’s Br. 56-57.
We reject this argument for several reasons. As an initial matter, section 404(c) allows the EPA to consider the effects of spoil disposal downstream from the fill itself and downstream water quality may enter the equation. The statute authorizes the Administrator “to deny or restrict the use of any defined area for specification” if he determines “that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas ..., wildlife, or recreational areas.” 33 *725 U.S.C. § 1344(c). The reference to “municipal water supplies,” id. is telling; how can the EPA assess whether a valley fill will have an “unacceptable adverse effect on municipal water supplies” without considering the effects of the valley fill on downstream water quality? We have little trouble concluding that, as part of the EPA’s overall authority, section 404(c) authorizes it to assess the effects of the fill beyond the fill’s footprint and that nothing in the statute prohibits water quality from being part of that assessment.
Mingo Logan essentially concedes the general point;[9] the real problem, it claims, is that the state of West Virginia has already determined that the fills will not cause water-quality problems downstream. Because the Congress has granted states power to regulate their own water quality under section 402, once a state has signed off on a project by granting a section 402 permit, Mingo Logan argues, the EPA is not authorized to reassess water quality under section 404(c) using its own ad hoc standards. If the EPA does so, Mingo Logan contends, it impermissibly traverses the Congress’s intent by ignoring the bright line between section 402 regulation and section 404 regulation and raises federalism concerns to boot.
Mingo Logan’s argument fundamentally misinterprets what the EPA does in evaluating changes in water quality attributable to the disposal of spoil in designated streams. It is true that section 402 grants a qualifying state broad authority to regulate its water quality, see 33 U.S.C. § 1342, and that regulation under sections 402 and 404 is generally distinct, see Coeur Alaska, Inc., 557 U.S. at 274, 276-77, 129 S.Ct. 2458. As the district court concluded, however, there is an important difference between “regulating” pollutant discharge under section 402 and identifying unacceptable adverse effects on four specific categories of resources as a result of spoil disposal under section 404(c). See Mingo Logan III, 70 F.Supp.3d at 177. Indeed, we do not take issue with Mingo Logan’s contention that, here, the primary authority under section 402 lies with West Virginia. Under the NPDES program, West Virginia permits the discharge of water from sediment ponds into natural streams based upon state water-quality criteria and sets conditions on those discharges to manage the flow of pollutants into natural waters within its jurisdiction. See 33 U.S.C. § 1342. In contrast, the EPA does none of these things; it does not intrude on West Virginia’s authority to regulate water quality under section 402 because the EPA is not regulating the discharge of pollutants into West Virginia waters downstream from the fill. It is instead assessing whether discharging spoil into a particular stream will produce “unacceptable adverse effeet[s]” on wildlife. Id. § 1344(c). And it evaluates the effects of that spoil — both inside and outside the fill’s footprint — in making its assessment, including the changes the spoil might bring about in downstream water quality.
This raises a third, related point. Although Mingo Logan makes much of the “EPA’s consideration of water quality,” see Appellant’s Br. 53, the EPA did not base its revocation decision on an evaluation of downstream water quality per se; rather, evaluating downstream water quality was just one step in its process of evaluating “unacceptable adverse effect[s]” on wildlife under section 404(c), see 33 U.S.C. § 1344(c). The EPA must connect conclusions it makes about downstream water to adverse effects on the specific resources listed in section 404(c) — municipal water *726 supplies, shellfishing areas or fisheries, wildlife or recreational areas. See id. It satisfied this obligation; it pinpointed the requisite connection between its water quality assessment and its adverse-effects conclusions regarding section 404(c) resources.[10] Specifically, it relied on studies showing that selenium levels above five micrograms per liter produce harmful effects on maeroinvertebrates, see Final Determination, at 60-61, and fish, see id. at 71-72, which in turn results in negative food-web[11] implications for the broader ecosystem, see id. at 68. And it included detailed information — including new information based on actual data from the Seng Camp Creek site, see infra at 727 — supporting its conclusion that a significant risk of selenium levels regularly exceeding five micrograms per liter would result at the Pigeonroost Branch and Oldhouse Branch sites. See Final Determination, at 52-58. The EPA also explained why elevated levels of conductivity it anticipated to occur downstream were harmful, citing “an accepted and peer reviewed approach” for measuring the effects of conductivity on maeroinvertebrates, see id. at 65-67. In addition, it explained the fact that conductivity in the range it expected would support golden algae growth,, which in turn would have negative effects on salamanders and fish, see id. at 69-71. In sum, the EPA’s consideration of downstream water quality as a means of evaluating the project’s adverse effects on wildlife was not arbitrary and capricious; rather, it was the product of reasoned decisionmaking supported by evidence in the record and based upon the EPA’s technical expertise.
C. EPA’s Explanation of its “Volte Face”
Mingo Logan’s final argument is that the EPA failed to adequately explain its revocation decision given that it allowed the 404 permit to proceed four years earlier. Mingo Logan argues that this change triggers the “more detailed” justification standard discussed in Fox, 556 U.S. at 515, 129 S.Ct. 1800, and because the “EPA cannot point to any new information — let alone substantial or more detailed information — that overcomes” its original decision not to veto the permit, Appellant’s Br. 32, we must set its Final Determination aside. Mingo Logan argues further that even under the ordinary APA explanation standard articulated in State Farm, 463 U.S. at 43, 103 S.Ct. 2856, the EPA has failed to adequately explain its decision to revoke; the “unacceptable” effects the EPA identified, Mingo Logan claims, typically result from any large-scale surface coal mine.
The district court rejected Mingo Logan’s assertion that a more detailed justification standard applies, concluding that, notwithstanding the EPA’s original acquiescence, it did not amount to a “policy”; accordingly, the EPA’s subsequent withdrawal decision was not a change of course triggering the more detailed Fox standard. Mingo Logan III, 70 F.Supp.3d at 163-68. We need not resolve the question of whether a “more detailed” explanatory *727 standard applies here because we find the EPA’s explanation adequate even assuming arguendo that it was required to supply “a more detailed justification” for its revocation decision, see Fox, 556 U.S. at 515, 129 S.Ct. 1800. It adequately explained how new information arising after the 404 permit issued informed its conclusion that the project would result in “unacceptable adverse effect[s]”-to wildlife. See 33 U.S.C. § 1344(c). Indeed, the EPA acknowledged early on in its Final Determination that the game had changed. Its comments on the matter are worth quoting at length:
Throughout the history of the Spruce No. 1 Surface Mine ... Permit, [the] EPA has raised concerns regarding adverse impacts to the environment. Additional data and information, including peer-reviewed scientific studies of the eeoregion, have become available since permit issuance. The peer-reviewed literature now reflects] a growing consensus of the importance of headwater streams[ ] [and] a growing concern about the adverse ecological effects of mountaintop removal mining, specifically with regard to the effects of elevated levels of total dissolved solids discharged by mining operations on downstream aquatic ecosystems....
Final Determination, at 8. The EPA then went on to describe — in detail — its assessment of the “unacceptable adverse effect[s]” both within the fills’ footprint and downstream from the valley fill.
Mingo Logan’s challenge to the adequacy of the EPA’s justification focuses exclusively on the EPA’s discussion of adverse effects in the valley fills’ footprint; it does not contest the sufficiency of the EPA’s downstream-effects justification.[12] And for good reason — the EPA plainly relied on extensive post-permit information in determining that the water-chemistry changes wrought by the fills would negatively affect wildlife. The EPA’s conclusions that increased levels of selenium and conductivity would cause “unacceptable adverse effects]” to wildlife were based upon data collected from an adjacent mine from 2007 to 2010, and — most relevant here — from water sources handling outflow from the Seng Camp Creek disposal site, the only site that became operational after the 404 .permit was originally issued. As far as substantial new information goes, it is difficult to think of more salient post-permit data than that collected from the very mine under consideration. The post-permit data from the Seng Camp Creek site and the adjacent mine indicated that selenium in waters flowing from these sites regular-, ly exceeded the selenium levels the EPA determined would produce harmful effects on wildlife. Moreover, the EPA’s discussion of how changes in water chemistry would negatively affect wildlife was extensive and also relied on scientific studies published post-permit, as well as on post-permit data regarding the risk factors for golden-algae growth and its associated adverse environmental effects. These explanations relying on new data are sufficient to satisfy the more detailed explanatory obligation discussed by Fox. The EPA’s “explanation” for “disregarding facts and circumstances that underlay or were engendered by the prior policy” was “reasoned,” Fox, 556 U.S. at 515-16, 129 S.Ct. 1800—new data from the Seng Camp Creek site confirmed that selenium and conductivity levels were rising to potentially harmful levels and would cause significant wildlife degradation if additional valley fills were constructed at Pigeonroost Branch and Oldhouse Branch.
*728 The same is true of the EPA’s explanations of the unacceptable adverse effects on wildlife within the valley fills’ footprint. Although Mingo Logan argues that the EPA’s explanation fails even the basic APA arbitrary-and-capricious standard because the allegedly “unacceptable” environmental effects the EPA identified are the “routine” environmental impacts associated with any dredge-and-fill discharge, Appellant’s Br. 44, the EPA explained why it viewed the adverse effects on wildlife as “significant” and therefore “unacceptable,” see 40 C.F.R. § 231.2(e), and how new information developed after the permit issued reasonably informed its conclusions. The following discussion summarizes the EPA’s multi-page explanation.
The EPA first noted that the sheer size of the Spruce No. 1 Mine project rebutted Mingo Logan’s characterization of the project’s effects on wildlife as routine. As the EPA explained, “[t]he Spruce No. 1 Mine ... is one of the largest mountaintop mining projects ever authorized in West Virgi[1] nia,” affecting approximately 3.5 square miles and resulting in the burial of approximately 7.48 miles of high-quality streams. Final Determination, at 15. “By way of comparison,” the EPA noted, “the project area would take up a sizeable portion of the downtown area of Pittsburgh, PA.” Id. Relatedly, the EPA cited the large number of species within the proposed fill, noting that watersheds within the Central Appalachian region are some of the continent’s most biologically diverse and that the Pi-geonroost Branch and Oldhouse Branch watersheds are no exception. Id. at 30-31, 47. The EPA gave great weight to both of these factors, explaining that a large part of the “significance” of the adverse environmental effects it predicted results from such a large-scale ecosystem disruption in one of most biologically diverse areas in the country. See id. at 30-31, 50.
The EPA also detailed the adverse effects — and the implications for the broader ecosystem — on specific categories of wildlife. The EPA explained that Pigeonroost Branch and Oldhouse Branch are home to a particularly diverse group of macroinver-tebrates and wide-scale elimination of these populations would have a significant negative impact on the broader “faunal food web” given that macroinvertebrates form its foundation. Id. at 47, 49-50. The EPA further explained how burying 6.6 miles[13] of stream will affect other wildlife directly — salamanders, fish and water-dependent birds.[14] The EPA estimated that roughly 250,000 salamanders would be killed within the fills’ footprint (5-6 salamanders per square meter) and that the large-scale loss of “a key component of the aquatic food web” will have “broader food web implications, as they ... serve as prey for numerous terrestrial and aquatic species found within the Spruce No. 1 Mine site, including fish, snakes, birds, mammals, turtles, frogs, crayfish and other salamanders.” Id. at 48. The EPA also explained that sampling data suggested five populations of fish would be directly — and *729 adversely — affected by the fill. Id. át 38-39, 48-49.
Moreover, these explanations were not, as Mingo Logan suggests, Appellant’s Br. 44-45, based purely on information the EPA had at its disposal before the 404 permit issued. Rather, it relied on a variety of post-permit data to support its conclusions and, where relevant, explained how circumstances had changed over time.
First, the EPA’s analysis cited several post-permit studies suggesting headwater streams like Pigeonroost Branch and Old-house Branch play an outsized role in the creation and preservation of a robust and diverse regional ecosystem. As the EPA explained, after the permit was issued, “the scientific literature reflected a growing consensus of the importance of head-water streams.” Final Determination, at 20. “Many [post- permit] studies,” the EPA went on, “now point to the role head-water streams play in the transport of water, sediments, organic matter, nutrients, and organisms to downstream environments; their use by organisms for spawning or refugia; and their contribution to regional biodiversity.” Id.
This general shift in perspective on the importance of headwater streams — under-girded by post-permit scientific evidence— permeates the EPA’s entire analysis of the environmental effects of the valley fill within the fills’ footprint. The EPA concluded that many of the direct adverse effects on wildlife within the disposal area are “unacceptable” because Pigeonroost Branch and Oldhouse Branch are “some of the last remaining streams within the Headwaters Spruce Fork sub-watershed and the larger Coal River sub-basin that represent ‘least-disturbed’ conditions and habitat that is essential for many species in the watershed.” Id. at 49. Consequently, the EPA explained, the streams “perform critical hydrologic and biological functions, support diverse and productive biological communities, contribute to prevention of further degradation of downstream waters, and play an important role within” the larger regional ecosystem. Id. Given “the evidence that these streams are some of the last, rare and important high quality streams in the watershed,” the EPA concluded that burying 6.6 miles of the streams with spoil would produce an “adverse impact ... that the aquatic ecosystem cannot afford.” Id. at 50.
Second, the EPA discussed additional post-permit evidence suggesting that its original estimates about the return of salamanders to the area were flawed. Pre-permit density measurements suggested that the spoil would kill approximately 250,000 salamanders within the fill area. According to the EPA, “it had been assumed that species populating these waters would return, sometimes years later, to reestablish a community.” Appellee’s Br. 43-44. Post-permit data suggested, however, that even after twenty years, salamanders were not returning as expected to sedimentation ditches generated by now-closed West Virginia coal mines. See Final Determination, at 48.
Third, although pre-permit data suggested few fish would be affected by the project, post-permit data suggested additional species would experience adverse effects. As the EPA explained, sampling for the environmental study of the project suggested only a limited number of species lived in the Pigeonroost Branch and Old-house Branch streams. Id. at 38. The EPA concluded, however, that the pre-permit data were not reliable because the sampling had been conducted during a drought period. See id. It cited post-permit fish sampling data from 2008 and 2009 that “revealed a fish assemblage” in the two streams. Id. Specifically, “[m]ottled seul-pin, as well as sporadic populations of *730 smallmouth bass and stonerollers were collected in Pigeonroost Branch,” whereas “only blacknose dace and creek chubs” had been found in the stream in 1999. Id. at 38, 39. And although “[n]o samples were collected in Oldhouse Branch” in 1999, the data indicated that blacknose dace and creek chubs also lived in that stream. Id. at 38-39.
Thus, assuming arguendo that the EPA was subject to the “more detailed justification” standard described in Fox, 556 U.S. at 515, 129 S.Ct. 1800, we conclude that its Final Determination satisfied that requirement. It plainly relied upon new data— including data from the Spruce No. 1 Mine site itself — and explained the relevance of these data in concluding that the project would have unacceptable adverse effects on wildlife downstream from the fill sites. It also adequately explained how the valley fill would have an unacceptable adverse effect on wildlife within the fill and it specifically explained the new “consensus” on the importance of headwater streams, id. at 20, new scientific evidence about salamander repopulation, and new, more representative data about the fish species living in the fill area in doing so.
A few words in closing are in order. First, we do not hold that the EPA is generally exempt from considering costs in evaluating whether to withdraw a previously approved disposal site under section 404(c). We need not and do not decide precisely what the EPA may and must consider in making a post-permit withdrawal decision; we hold only that it is not expected to balance costs never presented to it. Second, we do not hold whether the EPA’s site withdrawal after the Corps has issued a 404 permit must always satisfy the more detailed justification standard articulated in Fox, 556 U.S. at 515-16, 129 S.Ct. 1800. Again, we need not and do not decide that question because, even assuming the Fox standard applies, the EPA’s explanation satisfies it. Finally, we note that post-permit withdrawal under section 404(c) is a mighty power and its exercise will perhaps inevitably leave a permittee feeling as if the rug has been pulled out from under it. Nonetheless, this power is one the Congress has authorized the EPA to exercise and where, as here, the EPA has adequately explained why mine spoil disposal at two sites would cause “unacceptable adverse effect[s]” on “wildlife,” 33 U.S.C. § 1344(c), we must uphold its decision.
For the foregoing reasons, the judgment of the district court is affirmed.

So ordered.

. The CWA defines, "navigable waters” as "the waters of the United States, including the territorial seas.” 33 U.S.C. § 1362(7).

. Corps regulations define "fill material” as "material placed in waters of the United States where the material has the effect of (i) [rjeplacing any portion of a water of the United Stales with dry land[] or (ii) [cjhanging the bottom elevation of any portion of a water of the United States.” 33 C.F.R. § 323.2(e)(1). Examples include "rock, sand, soil, clay, plastics, construction debris, wood chips, [and] overburden from mining or other excavation activities.” Id. § 323.2(e)(2).

. The environmental litigation was stayed once the EPA requested that the Corps revoke Mingo Logan's 404 permit, see OVEC, 2009 WL 3014943, at *1-2 (S.D.W.Va. Sept. 15, 2009), and the stay was extended once the EPA initiated its review of the permit under section 404(c), see OVEC, 2009 WL 3424175, at *1-4 (S.D.W.Va. Oct. 21, 2009). It remains stayed as it relates to Mingo’s use of the Pigeonroost Branch and Oldhouse Branch disposal sites. See OVEC, Civil Action No. 3:05-0784 (Aug. 9, 2012), ECF No. 525.

. Due to the amount of area withdrawn, Min-go Logan refers to the challenged EPA decision as the "revocation” or "withdrawal” of its permit and we follow suit. See, e.g., Appellant's Br. 11, 18. We note, however, that Mingo Logan's 404 permit remains in effect at the Seng Camp Creek site.

. Indeed, Mingo Logan's comments in response to the EPA's Proposed Determination seemed to accept the EPA’s merits position on the reliance-costs issue — that the EPA need base its decision on environmental factors only. Mingo Logan argued that the EPA could consider only the adverse environmental effects of the project on the resources specifically listed in section 404(c) — (1) municipal water supplies, (2) shellfishing areas/fisheries, (3) wildlife habitat and (4) recreation areas. As Mingo Logan put it, "[t]he 404(c) resources are therefore included to the exclusion of other resources, areas and concerns. The familiar principle of expressio unius est exclusio alterius dictates that when a statute includes particular language to describe the scope of its application, this is to the exclusion of other areas of application.” Mingo Logan Coal Co., Comments in Response and in Opposition to the Proposed Determination 66 (June 3, 2010) (second emphasis added), J.A. 436.

. In fact, in its comments responding to the Recommended Determination, Mingo Logan did suggest for the first time that some kind of balancing was required but, in listing the relevant factors, it did not mention reliance costs: " 'Unacceptable,' like[1] 'significant,' is a relative term that must be weighed against the endangerment of the species, the size of the project, and any economic benefit from the project.” Mingo Logan Coal Co., Comments in Response and in Opposition to the Recommended Determination 6 n.ll (Nov. 29, 2010). Moreover, even this argument was not presented in the context of an arbitrary-and-capricious challenge. See id. at 6. Our dissenting colleague nevertheless argues that it is sufficient to preserve Mingo Logan’s costs claim. See Dissenting Op. at 738. Not so. The comment says nothing whatsoever about reli-anee costs so it cannot preserve Mingo Logan's claim on that point. The dissent asserts instead that it preserves some claim that a broader balancing is required. See id. Mingo Logan (once again), however, makes no such broad cost-balancing argument to us. It argues that its reliance costs and compliance history should have been considered — relying heavily on the language of Fox and the permit's role in encouraging reliance — but it never argues for the kind of broad balancing the dissent suggests is applicable — e.g., the EPA must consider “the harm to... coal miners who had been or would be employed at the mine” or the fact that the mine could “contribute millions of dollars to the local economy and lower the price of electricity.” See id. at 733-34.

. In reply to our dissenting colleague's one-paragraph cri de coeur characterizing Mingo Logan’s forfeiture as “entirely unfair” based on EPA's stance that costs are "irrelevant,” Dissenting Op. at 740-41, we have an equally pithy reply: A party has an obligation to substantiate its position, including in the face of its opponent’s rejection thereof. Cf. L.A. Tucker Truck Lines, Inc., 344 U.S. at 37, 73 S.Ct. 67 (agency's “predetermined policy” does not absolve party of its obligation to object thereto). Forfeiture here is hardly "unfair” to Min-go Logan but, in any event, its minimal proof of its costs — as far as we can tell — mirrors their de minimis nature. And even if the EPA could be tagged with the “bait-and-switch” charge — a proposition we roundly reject— Mingo Logan's failure to prove up its costs on review by the district court should mute its lament. In the end, Mingo Logan at no point — not before the EPA nor in district court — made any effort to describe its costs or make an argument about them. In that light, Mingo Logan can hardly now complain about unfairness. Moreover, as we have noted, supra nn. 720-21, Mingo Logan effectively accepted the EPA’s position on the relevance of its reliance costs. It is hardly "unfair” to expect Mingo Logan to have raised whatever arguments it might have about the EPA's position before the EPA itself.

. Selenium is "a naturally occurring chemical element that is an essential micronutrient, but can also have toxic effects following exposure to excessive amounts.” Final Determination, at 51. "Conductivity is the ability of a solution to carry an electric current at a specific temperature” and "is an excellent indicator of the total concentration of all ions” in a given solution. Id. at 58-59, 103 S.Ct. 2856. Salinity — "the amount of dissolved salt in a given body of water” — is "often expressed in terms of specific conductivity.” Id. at 58, 103 S.Ct. 2856.

. See Appellant’s Reply Br. 26 (“Mingo Logan [does not] deny that, in the absence of authorized State action, [the] EPA may take downstream water quality into account.

. The EPA specifically acknowledged that its conclusions about adverse effects on wildlife were "not dependent on a conclusion that West Virginia’s water quality standards will be violated at or downstream of the site.” Final Determination, at 51. It thus explicitly recognized that its consideration of downstream water quality was only an intermediate step in its section 404 environmental analysis.

. The food web refers to the interconnected manner in which species in an ecosystem act as food sources for others. See Final Determination, at 32-33; see also Nat'I Ass’n of Home Builders v. Babbitt, 130 F.3d 1041, 1052 n. 11 (D.C. Cir. 1997) (citing E.O Wilson, The Diversity of Life 308 (2d ed. 1992)).

. As discussed, however, Mingo Logan does challenge the EPA’s authority to consider downstream water quality at all. See supra at 723-24.

. Although the Spruce No. 1 mine called for filling a total of 7.48 miles of streams with spoil, see supra at 728, that number included the valley fill at the Seng Camp Creek site. The valley fills at the Pigeonroost Branch and Oldhouse Branch sites would fill 6.6 miles of stream.

. The district court found that the EPA's reliance upon the fills’ effects on a water-dependent bird — the Louisiana waterthrush— "dances close to the line of what is reasonable” given that the bird has never been observed in the project area. Mingo Logan III, 70 F.Supp.3d at 171 n. 23. The EPA has wisely stepped back from its reliance on this particular adverse effect as necessary to support its decision. See Appellee's Br. 45.

. To be precise, EPA’s authority is to prohibit specification of disposal sites for fill material. See Mingo Logan Coal Co. v. EPA, 714 F.3d 608 (D.C. Cir. 2013). In practice, that authority is often tantamount to authority to veto or revoke permits. For ease of reference, I therefore will refer to EPA’s Section 404(c) authority as a power to veto or revoke permits.